# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3165

_____

Jessica Baribeau; Jamie Jones; Kate    *
Kibby, on her own behalf and as    *
guardian for her minor brother    *
Kyle Kibby; Raphi Rechitsky; Jake    *
Sternberg; Christian Utne,    *
   *
      Appellants,    *
   *   Appeal from the United States
      v.    *   District Court for the
   *   District of Minnesota.
City of Minneapolis; Jane Harteau,    *
Inspector; Sgt. Tim Hoeppner; Sgt.    *     [PUBLISHED]
E.T. Nelson; Sgt. John Billington;    *
Sgt. D. Pommerenke; Sgt. Erica    *
Christensen; Tim Merkel, Officer;    *
Roderic Weber, Officer; Sherry    *
Appledorn, Officer; Jeanine Brudenell,    *
Officer; Robert Greer, Officer; Jane    *
Roe, Officer (whose true name is    *
unknown); Jane Doe, Officer (whose    *
true name is unknown); County    *
of Hennepin; Sean Kennedy; Becky    *
Novotny; Sam Smith (whose true name    *
is unknown); Mary Jones, Officer    *
(whose true name is unknown),    *
   *
      Appellees.    *

_____

Submitted: June 9, 2009
Filed: February 24, 2010

_____

Before COLLOTON, JOHN R. GIBSON, and BEAM, Circuit Judges.

—————————

PER CURIAM.

Jessica Baribeau, Jamie Jones, Kate Kibby, Kyle Kibby, Raphi Rechitski, Jake Sternberg, and Christian Utne (collectively, "the plaintiffs") brought suit against the City of Minneapolis and thirteen of its police officers. The plaintiffs alleged that they were seized without probable cause and in retaliation for exercising their First Amendment rights. Sternberg also sued the County of Hennepin and various of its employees, alleging that the confiscation of his prosthetic leg while he was in the county jail violated his rights under the Fourth, Fifth, and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* The district court granted summary judgment in favor of the City and its officers on the plaintiffs' claims, and in favor of the County and its employees on Sternberg's claims. We affirm in part and reverse and remand in part.

I.

At about 6 p.m. on Saturday, July 22, 2006, the plaintiffs met at the Nicollet Mall light rail station in downtown Minneapolis, while the city was in the midst of hosting a week-long summer festival known as the Aquatennial. The plaintiffs' plan was to protest the "mindless" nature of consumer culture by walking through the downtown area dressed as zombies. Most of the plaintiffs wore white powder and fake blood on their faces and dark makeup around their eyes.

From their meeting place, the plaintiffs proceeded down Nicollet Mall, walking in a stiff, lurching fashion. They carried four bags of sound equipment. One bag contained an iPod, a radio transmitter, an antenna, and a wireless phone handset. The others contained radio receivers, amplifiers, and speakers. Some of the equipment,

including wiring, was visible on the outside of the bags. As the plaintiffs "danced" their way down the street, they played music from the iPod, through the radio devices, and over the speakers. They also broadcasted announcements such as "get your brains here" and "[b]rain cleanup in Aisle 5" by speaking into the wireless phone handset. The plaintiffs came within three feet of bystanders, and received "weird" looks from some they passed.

At around 7 p.m., Minneapolis police received word of an anonymous 911 call complaining about a group of "people covered in make up playing loud music from a boombox" on Nicollet Mall. J.A. 219 (capitalization removed). According to the caller, the group's members were "calling themselves zombies and almost touching people." *Id.* (capitalization removed). Officers James Archer and Chad Martin responded to the call and were the first to arrive on the scene. They found the plaintiffs playing music and dancing as zombies near the intersection of South Seventh Street and Nicollet Mall. Officers Timothy Merkel and Roderic Weber arrived shortly thereafter. When approached by the officers, the plaintiffs explained that they meant their actions as an anticonsumerist commentary. According to Officer Martin, the plaintiffs were "walking around, coming up close to people," and pedestrians were "scooting away from them." The officers informed the plaintiffs that their conduct had garnered a complaint, and asked them to turn down their music and keep their distance from bystanders. After this brief exchange, the officers allowed the plaintiffs to continue on their way.

Merkel and Weber subsequently spoke about the plaintiffs with Sergeant Timothy Hoeppner, who was in charge of patrolling the area for drunk people that evening. Based on information in a police bulletin, Hoeppner expressed concern that the plaintiffs were affiliated with the Juggalos, a violent gang from Washington State known for wearing face paint. Merkel and Weber decided to approach the plaintiffs again, in an effort to identify them.

When Merkel and Weber found them, the plaintiffs were no longer dancing or playing music, but were gathered on a sidewalk near the corner of Sixth Street and Hennepin Avenue. As part of a larger crowd, the plaintiffs had just finished watching an outdoor performance by a high school drumline. According to Weber, a young girl with her father saw the plaintiffs "dressed up in the zombie appearance," and became frightened. Merkel and Weber asked the plaintiffs for identification, but most of them were not carrying identification with them. The officers informed the plaintiffs that they were being taken to the police station to be identified. Sternberg asked whether they were being "detained," and one of the officers responded, "Yes." Sternberg then asked, "What's the charge?" The officer said, "I don't know, let's call it disorderly conduct for now." The officers escorted the plaintiffs to a station several blocks away.

At the station, the plaintiffs were met by numerous officers, including the officer in charge, Sergeant Edward Nelson. Sternberg testified that Nelson acted like "a drill sergeant with new recruits," and said that he didn't "give a g**damn about anybody's constitutional f***ing rights." The plaintiffs were patted down and placed in a holding cell, from which they were removed one at a time for questioning about their identities. In addition, officers searched the plaintiffs' bags. Based on the equipment inside, Nelson became concerned that the bags were dangerous, and requested that they be inspected by Sergeant Daniel Pommerenke, a bomb technician. Pommerenke determined that the bags did not contain explosives. After consulting with other officers, however, Nelson ordered the plaintiffs booked into jail on charges of displaying simulated weapons of mass destruction ("WMD"), a state offense punishable by up to ten years' imprisonment. Minn. Stat. § 609.712, subd. 5(1).

All but one of the plaintiffs were transported to the Hennepin County Adult Detention Center.[1] During the booking process, Sternberg refused to reveal his last

[1]Kyle Kibby, a minor, was taken to the Hennepin County Juvenile Detention Center and released on the same day as the others.

-4-

name. Jail officials noted that Sternberg had metal accessories in his hair, and placed him in a holding cell where he could remove them. They also noted that Sternberg had a prosthetic left leg, from the knee down, that contained metal parts. After discussing his medical condition with Sean Kennedy, the nurse on duty, Sternberg was taken to another room, where his prosthetic leg was confiscated by Becky Novotny, a detention deputy. Kennedy explained to Sternberg that the leg was seized out of concern that it could be used as a weapon. Sternberg agreed to provide his last name in order to finish the booking process and obtain a property receipt for his leg. Sternberg was given a wheelchair and was eventually placed in an ADA-compliant cell.

On the following Monday, after spending two nights in jail, the plaintiffs were released from custody. A sergeant reviewing the plaintiffs' arrests had examined the equipment seized from their bags, and concluded that the equipment did not meet the definition of simulated WMD. At the time of release, the plaintiffs received back all of their seized property, including Sternberg's prosthetic leg. Authorities never filed a formal criminal complaint against any of the plaintiffs.

The plaintiffs filed suit in Minnesota state court against the City of Minneapolis and thirteen of its police officers, including Merkel, Weber, Hoeppner, Nelson, and Pommerenke, in their personal and official capacities. The plaintiffs asserted a right to damages under 42 U.S.C. § 1983 on numerous federal claims. Their complaint included allegations that they were arrested "without any cause to believe that they had committed a crime," in violation of the Fourth Amendment, and that they were seized in retaliation for "exercising their basic and fundamental right to engage in artistic and political expression," in violation of the First Amendment. The plaintiffs also brought several state-law causes of action, including a claim of false imprisonment.

In the same complaint, Sternberg sued the County of Hennepin and various county employees, including Kennedy and Novotny, in their personal and official capacities. Sternberg alleged that the confiscation of his prosthetic leg contravened the prohibition on unreasonable seizures in the Fourth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. He also claimed that the County and its employees "discriminated against [him] by denying him benefits of services and programs because of his disabilities, and failing to accommodate [his] disabilities," in violation of the ADA and the MHRA.

The City and its police officers removed the case to federal district court, and moved for summary judgment on the plaintiffs' claims. The district court granted the motion. *Baribeau v. City of Minneapolis*, 578 F. Supp. 2d 1201, 1224 (D. Minn. 2008). The court concluded that the plaintiffs' Fourth Amendment claim failed because "the behavior of Plaintiffs observed by law enforcement could justify a reasonably prudent person in believing that Plaintiffs had committed the crime of disorderly conduct." *Id.* at 1214. The court determined that even if probable cause to arrest for disorderly conduct did not exist, the officers were entitled to qualified immunity. Although the plaintiffs' equipment did not qualify as simulated WMD, the court reasoned, "it would not have been clear to a reasonable officer that Plaintiffs could not be arrested for [displaying simulated WMD]." *Id.* at 1216. The court dismissed the plaintiffs' claims of First Amendment retaliation and false imprisonment, on the ground that probable cause existed to arrest the plaintiffs for disorderly conduct. *Id.* at 1217-18.

The County and its employees also moved for summary judgment, and the district court granted that motion as well. *Id.* at 1224. The court reasoned that because the confiscation of Sternberg's prosthetic leg was "reasonably related to the legitimate governmental interest in jail security," his rights under the Fourth, Fifth, and Fourteenth Amendments were not violated. *Id.* at 1223-24. The court also determined that the County and its employees were entitled to judgment as a matter

of law under the ADA and the MHRA, because Sternberg failed to establish that "following seizure of his leg, provision of a wheelchair and an ADA-compliant cell was not a reasonable accommodation." *Id.* at 1222.

The plaintiffs appeal. We review the grant of summary judgment *de novo*, viewing the facts in the light most favorable to the plaintiffs. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). Summary judgment is appropriate if there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II.

We begin with the claims brought by all of the plaintiffs alleging violations of the United States Constitution and Minnesota law. The district court granted summary judgment in favor of the City and its police officers on these claims, and the plaintiffs appeal only the judgment in favor of the officers in their personal capacities. The doctrine of qualified immunity protects the officers from personal liability under § 1983 "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (internal quotation omitted). In addition, under Minnesota law, the doctrine of official immunity shields the officers from personal liability unless they are "guilty of a wilful or malicious wrong." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).

## A.

The plaintiffs first argue that they were arrested in violation of their clearly established Fourth Amendment rights. We agree.

As mentioned above, the doctrine of qualified immunity protects government officials such as police officers from individual liability under § 1983, unless their conduct violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Pearson*, 129 S. Ct. at 815 (internal quotation omitted). To overcome the defendants' qualified immunity claims, the plaintiffs must show that: "(1) the facts, viewed in the light most favorable to the plaintiff[s], demonstrate the deprivation of a constitutional . . . right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). The Supreme Court recently made it clear that we are allowed to exercise our "sound discretion" to decide which qualified immunity prong we address first, "in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818. In this case, we find it most beneficial to first address whether the facts, when considered in the plaintiffs' favor, establish a violation of the plaintiffs' Fourth Amendment rights.

The plaintiffs argue that Merkel and Weber violated their Fourth Amendment rights because Merkel and Weber had no probable cause to arrest the plaintiffs for misdemeanor disorderly conduct. In *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), the Supreme Court held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). In this case, the plaintiffs were arrested when Merkel and Weber decided to take them to the police station. *See Dunaway v. New York*, 442 U.S. 200, 212-13 (1979). We thus examine whether probable cause to arrest the plaintiffs existed at that time.

"[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of

legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotation omitted). A "reasonable ground for belief" means "more than bare suspicion," but "less than evidence which would justify condemnation or conviction." *Id.* (internal quotations omitted). "Probable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* at 175-76 (internal quotation and brackets omitted).

We conclude that the arresting officers, Merkel and Weber, did not have probable cause to arrest the plaintiffs for committing misdemeanor disorderly conduct. Minnesota's disorderly conduct statute, in relevant part, provides:

> Whoever does any of the following in a public or private place, . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others . . . , is guilty of disorderly conduct, which is a misdemeanor:
>
> . . . .
>
> (3) engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72, subd. 1.

The plaintiffs assert that there was no probable cause for their arrest because Minnesota's disorderly conduct statute is subject to a narrowing construction which excludes their conduct. The interpretation of the disorderly conduct statute is a question of Minnesota state law. When interpreting Minnesota's statutes, we are bound by the decisions of the Minnesota Supreme Court. *Hope v. Klabal*, 457 F.3d

784, 790 (8th Cir. 2006). If the Minnesota Supreme Court has not decided an issue, we must predict how that court would decide the issue. *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 391 F.3d 907, 911 (8th Cir. 2004). In making such a prediction, we may consider relevant state precedent and analogous decisions. *Id.* Decisions from the Minnesota Court of Appeals are "particularly relevant" and we must follow such decisions when they are the best evidence of Minnesota law. *Id.* at 912.

To narrowly interpret the disorderly conduct statute, the plaintiffs rely on *In re Welfare of S.L.J.*, 263 N.W.2d 412 (Minn. 1978). In that case, a teenaged girl was arrested for disorderly conduct after saying "f*** you pigs" to police officers. *Id.* at 415. She subsequently challenged the disorderly conduct statute for vagueness and overbreadth under the First and Fourteenth Amendments. *Id.* at 416. The Minnesota Supreme Court concluded that absent a narrowing construction, the statute's prohibition on "offensive, obscene, or abusive language" tending reasonably to "arouse alarm, anger, or resentment in others" violated the First Amendment. *Id.* at 418-19. Thus, to preserve the constitutionality of the statute, the court construed that prohibition to extend only to "fighting words"–words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 419 (quotation omitted).

The plaintiffs contend that the *S.L.J.* narrowing construction applies to expressive conduct as well as verbal speech. Specifically, they argue that where, as here, the conduct at issue is expressive in nature, it does not fall within the scope of the statute unless, like "fighting words," it tends to provoke retaliatory violence or incite imminent lawless action. To address this argument, we first note that Minnesota courts have "closely scrutinized" charges brought under this particular disorderly conduct statute due to First Amendment concerns. *In re Welfare of M.A.H.*, 572 N.W.2d 752, 757 (Minn. Ct. App. 1997) (quotation omitted).

Moreover, while the *S.L.J.* court did not specifically address whether the narrowing construction applies to expressive conduct, the Minnesota Supreme Court has duly recognized that "First Amendment protection is not limited to the written or spoken word; it extends to some expressive activity, because the activity by itself may be communicative." *State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998). An actor's conduct is sufficiently expressive to merit First Amendment protection if the actor had "'[a]n intent to convey a particularized message . . . and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Id.* at 419-20 (first alteration in original) (*quoting Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (per curiam)). "'[A] narrow, succinctly articulable message is not a condition of constitutional protection.'" *Robb v. Hungerbeeler*, 370 F.3d 735, 744 (8th Cir. 2004) (alteration in original) (*quoting Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995)). That is not to say that all communicative conduct is protected. Conduct cannot be labeled "speech" whenever a person intends to express an idea. *Machholz*, 574 N.W.2d at 420 (*citing United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Indeed, when "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.'" *Machholz*, 574 N.W.2d at 420 (*quoting O'Brien*, 391 U.S. at 376)).

In *Machholz*, the Minnesota Supreme Court applied these principles to invalidate a Minnesota harassment statute both on its face and as applied. *Id.* at 417. There, the defendant mounted his horse in downtown Rochester, Minnesota, and rode through a group of people gathered to celebrate National Coming Out Day–an annual celebration for homosexuals, their families, and their friends. *Id.* at 417-18. As he made approximately four passes through the crowd on his horse, the defendant shouted: "You're giving us AIDS!"; "You're spreading your filth!"; "There are no homosexuals in heaven!"; and "You're corrupting our children!" *Id.* at 418. He also swung a rope and knocked down a sign advertising the event. *Id.* A number of

onlookers indicated that, due to the defendant's actions, they felt "threatened and frightened." *Id.* The defendant was subsequently arrested and charged with felony harassment. *Id.* The Minnesota harassment statute criminalized harassing conduct–intentional conduct that "(1) would cause a reasonable person under the circumstances to feel oppressed, persecuted, or intimidated; and (2) causes this reaction on the part of the victim." *Id.*

The Minnesota Supreme Court first held that the harassment statute was facially overbroad under the First Amendment. The court noted that "[t]he broad reach of the statutory language [was] not limited to nonexpressive conduct," and thus impermissibly encompassed protected "expressive activity." *Id.* at 420. The State argued that the statute was still valid because it could be construed narrowly to only apply to fighting words. *Id.* However, the court determined the statute's language was too broad to support such a narrowing construction. *Id.* The court explained that the statute's broad language would impermissibly criminalize expressive conduct the Supreme Court has afforded First Amendment protection, such as cross burning or displaying swastikas during a march in a community where Holocaust survivors reside. *Id.*; *see R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992); *Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43 (1977) (per curiam). Moreover, the statute was overbroad because it would criminalize day-to-day activities, such as a basketball coach yelling at her team and throwing a clipboard across the locker room to deliberately intimidate players into playing harder. *Machholz*, 574 N.W.2d at 421.

The court then held that the statute was overbroad as applied to the defendant because he was engaged in protected expressive activity. *Id.* Specifically, the court determined that, through his words and conduct, the defendant intended to convey opposition to the homosexual lifestyle, and that a reasonable onlooker under these circumstances would have understood that message. *Id.* The court further explained that "in some instances it is possible to separate protected speech from unprotected conduct, [but] under the facts of this case, we cannot find a way to logically do so.

-12-

The words used by [the defendant] are inextricably linked to the conduct of riding his horse through the crowd." *Id.*

While the *Machholz* court did not interpret the disorderly conduct statute at issue in this case, *Machholz* is analogous to the present case and is therefore instructive as we predict whether the Minnesota Supreme Court would apply the *S.L.J.* "fighting words" narrowing construction to expressive conduct as well as verbal speech. We conclude that, in light of *Machholz*, the *S.L.J.* narrowing construction necessarily applies to protected expressive conduct. Otherwise, the disorderly conduct statute's prohibition of "boisterous" and/or "noisy" conduct "tending reasonably to arouse alarm, anger, or resentment in others," Minn. Stat. § 609.72, subd. 1(3), would impermissibly criminalize conduct the *Machholz* court recognized as protected speech–i.e, protesting homosexuality by riding a horse through a crowd in downtown Rochester, Minnesota, swinging a rope, knocking over a sign, and shouting anti-homosexual statements at a group gathered to celebrate National Coming Out Day. Similarly, without a narrowing construction, this statute would impermissibly criminalize other expressive conduct the *Machholz* court recognized as protected speech, such as a basketball coach shouting and throwing her clipboard across the locker room at halftime. Indeed, if the Minnesota Supreme Court was willing to invalidate the harassment statute for criminalizing such expressive conduct, it would at least apply the fighting words narrowing construction to exclude such conduct from the disorderly conduct statute.

Having established that the *S.L.J.* narrowing construction applies to protected expressive conduct, we now consider whether the plaintiffs were engaged in such conduct. We conclude that the plaintiffs were engaged in protected expressive conduct. The plaintiffs intended to protest mindless consumerism when they dressed in zombie costumes, walked erratically, and broadcasted anti-consumerism statements over a makeshift, portable sound system. Moreover, under the surrounding circumstances, the likelihood was great that the plaintiffs' artistic and symbolic

message would be understood by those who viewed the protest. As the Supreme Court explained in *Hurley*, 515 U.S. at 569, "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." (internal citation omitted). Indeed, onlookers would have understood the plaintiffs' symbolic anti-consumerism message in much the same way onlookers would understand the artistic messages in protected paintings, music, or poems. We acknowledge that, in some instances, it may be possible to separate a speaker's protected speech and expressive conduct from his unprotected, non-expressive conduct. However, under the facts in this case, "we cannot find a way to logically do so" because, like the defendant's conduct in *Machholz*, the plaintiffs' costumes, music, statements, and erratic walking were "inextricably linked" to their anti-consumerism message. *Machholz*, 574 N.W.2d at 421.

The defendants argue that *In re Welfare of T.L.S.*, 713 N.W.2d 877 (Minn. Ct. App. 2006), demands a broader construction of the disorderly conduct statute when conduct is at issue. In that case, police arrested a girl for engaging in "boisterous" and "noisy" conduct after she "shrieked" profanities inside a school administration office. *Id.* at 881. The shrieking was so loud that it was "disruptive to the running of the school and purposes of the school." *Id.* at 879. The girl challenged her arrest for disorderly conduct under *S.L.J.*, arguing that the officers could not arrest her for using profanity. *Id.* at 880. However, the court held that while *S.L.J.*'s narrowing construction applied to profanity, it did not apply to the girl's shrieking. *Id.* at 881. Specifically, the court held that "the statute may be applied to punish the manner of delivery of speech *when the disorderly nature of the speech does not depend on its content*." *Id.* at 881 (emphasis added). In other words, the statute may be applied to boisterous and noisy *non-expressive* conduct, such as shrieking. Simply put, the court in *T.L.S.* was able to separate the girl's protected speech from her non-expressive shrieking. Given that non-expressive conduct is not afforded First Amendment

-14-

protection, the narrowing construction did not apply to such conduct. However, as discussed above, the plaintiffs' conduct in this case, like the defendant's conduct in *Machholz*, is expressive and inextricably linked to their protected message. Thus, *T.L.S.* is not contrary to our decision.

Finally, the disorderly conduct statute applies to the plaintiffs' expressive conduct if that conduct amounted to "fighting words," or words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *S.L.J.*, 263 N.W.2d at 419 (quotation omitted). Here, the plaintiffs were engaging in a peaceful anti-consumerism protest and we find nothing in the record to suggest that their expressive conduct even remotely amounted to "fighting words."

Therefore, because the plaintiffs' conduct was expressive conduct and did not amount to fighting words, their conduct clearly did not fall within the narrowed reading of the disorderly conduct statute. Thus, there was no probable cause to believe the plaintiffs' expressive conduct violated the statute. Accordingly, we hold that Merkel and Weber violated the plaintiffs' Fourth Amendment rights.

Despite our conclusion that the defendants engaged in constitutionally impermissible conduct when they arrested the plaintiffs without probable cause, they "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The fundamental question under this analysis is whether the state of the law, as it existed at the time of the arrest, gave the defendants "fair warning" that the arrest was unconstitutional. *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007). "The Supreme Court . . . has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." *Id.* (*quoting Hope*, 536 U.S. at 741).

It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment. *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999). In the wrongful arrest context, officers are entitled to qualified immunity "if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). In other words, we must determine whether Merkel and Weber had "arguable probable cause" to arrest the plaintiffs for disorderly conduct. *Id.*

We conclude that Merkel and Weber did not have arguable probable cause to arrest the plaintiffs. The state of the law at the time of the arrests was clearly established such that a reasonable person would have known there was no probable cause to arrest the plaintiffs for engaging in protected expressive conduct under the disorderly conduct statute. The Minnesota Supreme Court's 1978 decision in *S.L.J.* clearly limited the disorderly conduct statute to "fighting words" when "language" is implicated. Moreover, the court's 1998 decision in *Machholz* made it clear that the *S.L.J.* narrowing construction applies to protected expressive conduct. After all, in light of *Machholz*, an objectively reasonable person would not think probable cause exists to arrest a man under Minnesota's disorderly conduct statute if the man was protesting homosexuality by riding his horse through a crowd gathered to celebrate National Coming Out Day, shouting anti-homosexual statements, swinging a rope, and knocking over signs advertising the event. Accordingly, an objectively reasonable person would not think probable cause exists under the Minnesota disorderly conduct statue to arrest a group of peaceful people for engaging in an artistic protest by playing music, broadcasting statements, dressing as zombies, and walking erratically in downtown Minneapolis during a week-long festival. Merkel and Weber arrested the plaintiffs in 2006–well after the Minnesota Supreme Court's decisions in *S.L.J.* and *Machholz*. Thus, the Minnesota Supreme Court's cases in *S.L.J.* and *Machholz* provided Merkel and Weber with a fair warning that the arrests were unconstitutional.

Alternatively, the defendants argue that they are entitled to qualified immunity because probable cause existed to arrest the plaintiffs for displaying simulated WMD. In relevant part, the WMD statute provides:

> Whoever does the following with intent to terrorize another or cause evacuation of a place, whether a building or not, or disruption of another's activities, or with reckless disregard of the risk of causing terror, evacuation, or disruption, may be sentenced to imprisonment for not more than ten years or to payment or a fine of not more than $20,000, or both:
>
> > (1) displays a weapon of mass destruction or a simulated weapon of mass destruction.

Minn. Stat. § 609.712, subd. 5. The statute defines "simulated weapon of mass destruction" as:

> any device, substance, or object that by its design, construction, content, or characteristics, appears to be or to contain, or is represented to be, constitute, or contain, a weapon of mass destruction, but that is, in fact, an inoperative facsimile, imitation, counterfeit, or representation of a weapon of mass destruction that does not meet the definition of a weapon of mass destruction or that does not actually contain or constitute a weapon, biological agent, toxin, vector, or delivery system prohibited by this section.

Id. § 609.712, subd. 1(c). "Weapon of mass destruction" is defined to include:

> weapons, substances, devices, vectors, or delivery systems that:
>
> (1) are designed or have the capacity to cause death or great bodily harm to a considerable number of people through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors, disease organisms, biological agents, or toxins; or

(2) are designed to release radiation or radioactivity at a level dangerous to human life.

*Id.* § 609.712, subd.1(f).

The Minnesota Supreme Court has not interpreted this statute. The district court explained that it is not clear under the above provisions whether simulated WMD must resemble WMD in all regards or merely in some or most regards. *Baribeau*, 578 F. Supp. 2d at 1215. In light of this ambiguity, the court predicted that the Minnesota Supreme Court would likely construe the statute narrowly and require that simulated WMD feature some simulated biological, chemical, or radioactive element. *Id.* at 1215-16. Under that reading, the court held that probable cause did not exist because the plaintiffs did not display biological, chemical, or radioactive elements. *Id.* at 1216. However, the court emphasized the statute's ambiguity and lack of judicial guidance, and held that the defendants were entitled to qualified immunity because "it would not have been clear to a reasonable officer" that the plaintiffs could not be arrested for displaying simulated WMD. *Id.*

We agree with the district court that there was no probable cause to arrest the plaintiffs for displaying simulated WMD. However, we do not agree that arguable probable cause existed to arrest the plaintiffs. We acknowledge that "[i]n close qualified immunity cases, the absence of judicial guidance can be significant because '[p]olice officers are not expected to parse code language as though they were participating in a law school seminar.'" *Walker v. City of Pine Bluff*, 414 F.3d 989, 993 (8th Cir. 2005) (second alteration in original) (*quoting Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1108 (8th Cir. 2004)). However, the facts in this case did not require officers to parse code language.

As a part of their artistic anti-consumerism protest, the plaintiffs carried four bags of sound equipment. The bags contained an iPod, a radio transmitter, an antenna,

a wireless phone handset, radio receivers, and speakers. Some of the sound equipment, including wiring and an on/off switch for the music, was visible on the outside of the bags. The plaintiffs were clearly using this equipment to broadcast anti-consumerism statements and music. Though we recognize the seriousness of WMD offenses, we cannot say that displaying and using portable sound equipment for its natural purpose–i.e., to transmit and broadcast sound waves–even remotely satisfies the statute's definition of displaying simulated WMD. Therefore, even if the WMD statute did not require the plaintiffs to display biological, chemical, or radioactive elements, a reasonable person would not have believed probable cause existed to arrest the plaintiffs for displaying simulated WMD. Accordingly, the defendants are not entitled to qualified immunity because they violated the plaintiffs' clearly established rights when they arrested the plaintiffs without arguable probable cause that the plaintiffs had displayed simulated WMDs.

We reverse the district court's grant of summary judgment in favor of the defendants in their individual capacities on the plaintiffs' Fourth Amendment claim because the doctrine of qualified immunity does not shield the defendants from the claim.

B.

The plaintiffs next argue that they were seized in retaliation for exercising their First Amendment right of free speech. The district court held that the defendants were entitled to summary judgment on this claim because there was probable cause for the arrest. *Baribeau*, 578 F. Supp. 2d at 1217. As discussed above, the defendants did not have probable cause or even arguable probable cause to arrest the plaintiffs. Therefore, we must examine the plaintiffs' retaliation claim.

Like the wrongful arrest claim above, the plaintiffs' retaliation claim requires qualified immunity analysis. A citizen's right to exercise First Amendment freedoms

"without facing retaliation from government officials is clearly established." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007). Therefore, our only question is whether a reasonable jury could find that Merkel and Weber violated this right when they arrested the plaintiffs following their anti-consumerism protest. *Id.*

"To prevail in an action for First Amendment retaliation, 'plaintiff must show a causal connection between a defendant's retaliatory animus and [plaintiff's] subsequent injury.'" *Osborne v. Grussing*, 477 F.3d 1002, 1005 (8th Cir. 2007) (alteration in original) (*quoting Hartman v. Moore*, 547 U.S. 250, 259 (2006)). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in" the decision to arrest. *Kilpatrick*, 499 F.3d at 767 (*quoting Wishnatsky v. Rovner*, 433 F.3d 608, 613 (8th Cir. 2006)). Furthermore, the plaintiffs must show that the retaliatory motive was a "but-for" cause of the arrest–i.e., that the plaintiffs were "singled out" because of their exercise of constitutional rights. *Id.* Finally, the plaintiffs must show that the officers' "adverse action caused [them] to suffer an injury that would 'chill a person of ordinary firmness' from continuing in the protected activity.'" *Williams v. City of Carl Junction*, 480 F.3d 871, 878 (8th Cir. 2007) (*quoting Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir. 2001)).

As discussed above, the defendants made an unreasonable mistake when they arrested and detained the plaintiffs without arguable probable cause to believe the plaintiffs either engaged in disorderly conduct or displayed simulated WMD. That unreasonable mistake is enough to defeat the defendants' qualified immunity claim for wrongful arrest under the Fourth Amendment. However, we cannot say that a reasonable jury could find that retaliatory animus was a substantial factor or "but-for" cause of the plaintiffs' arrest and detention. The evidence demonstrates that Merkel and Weber arrested the plaintiffs after Weber claimed to have observed a young girl become frightened by the plaintiffs' appearance, which he unreasonably believed constituted "disturbing the peace." Moreover, there is no evidence to suggest that the decision to arrest the plaintiffs for displaying simulated WMD was not based on an

actual but overly exaggerated belief that the plaintiffs violated the WMD statute. Accordingly, we conclude that the defendants are entitled to qualified immunity and we grant summary judgment in favor of the defendants on the plaintiffs' First Amendment retaliation claim.

## C.

The plaintiffs' final argument is that the officers committed the state-law tort of false imprisonment. The district court granted the defendants' motion for summary judgment on this claim after finding that probable cause existed to arrest the plaintiffs for disorderly conduct, and that arguable probable cause existed to arrest and detain the plaintiffs for displaying simulated WMD. *Baribeau*, 578 F. Supp. 2d at 1218-19. Since we have found that neither probable cause nor arguable probable cause existed to support the arrests and detentions, we must now analyze the plaintiffs' false imprisonment claim.

Under Minnesota law, "if an arrest is made without proper legal authority, it is a false arrest, and so false imprisonment." *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (Minn. 1974). An arrest for a misdemeanor conforms to Minnesota law as long as police officers have observed conduct giving rise to probable cause to believe that the offense was committed. *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990); *Henry v. Comm'r of Public Safety*, 357 N.W.2d 121, 122-23 (Minn. Ct. App. 1984); *see* Minn. Stat. § 629.34, subd. 1(c)(1). In addition, police officers exercising judgment or discretion are entitled to official immunity unless they commit a "willful or malicious wrong." *State ex rel. Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 569 (Minn. 1994). The "willful and malicious wrong" standard contemplates "whether the official has intentionally committed an act that he or she had reason to believe is prohibited." *Id.* at 571. "This is a subjective standard, in contrast to the objective qualified immunity standard." *Nelson v. County of Wright*, 162 F.3d 986,

991 (8th Cir. 1998) (*citing Elwood v. County of Rice*, 423 N.W.2d 671, 676-79 (Minn. 1988)).

The plaintiffs allege that the defendants acted with subjective malice when they arrested and detained the plaintiffs. However, "[m]ere allegations of malice are not sufficient to support a finding of malice, as such a finding must be based on specific facts evidencing bad faith." *Semler v. Klang*, 743 N.W.2d 273, 279 (Minn. Ct. App. 2007) (internal quotation omitted). Here, the plaintiffs have not produced evidence to suggest that Merkel and Weber intentionally arrested and detained the plaintiffs for disorderly conduct while knowing they had no probable cause to do so. Also, the plaintiffs have produced no evidence that the decision to detain the plaintiffs for displaying simulated WMD was not based on a subjective good faith belief that the WMD statute might possibly be applicable. Accordingly, the defendants are entitled to official immunity under Minnesota law and we grant summary judgment in favor of the defendants on the plaintiffs' state-law false imprisonment claim. *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006); *Nelson*, 162 F.3d at 991.

For the above reasons, we reverse the district court's grant of summary judgment in favor of the defendants on the plaintiffs' wrongful arrest claim. We affirm the district court's grant of summary judgment in favor of the defendants on the plaintiffs' retaliation and false imprisonment claims. However, unlike the district court, we base our decision to deny summary judgment not on the presence of probable cause, but on the plaintiffs' failure to provide evidence demonstrating retaliatory animus and bad faith.

III.

We turn next to Sternberg's claims under the Fourth, Fifth, and Fourteenth Amendments challenging the confiscation of his prosthetic leg at the county jail. The district court granted summary judgment in favor of the County and its employees on these claims. Sternberg does not appeal the judgment in favor of the County; he appeals only the judgment in favor of the county employees in their personal capacities. Under the doctrine of qualified immunity, a county employee may be held personally liable for a constitutional violation only if his own conduct violated a clearly established constitutional right. *Pearson*, 129 S. Ct. at 816.

A.

Sternberg contends that the confiscation of his prosthetic leg violated his Fourth Amendment right to be free from unreasonable seizures. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court assumed, without deciding, that "inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility." *Id.* at 558. Proceeding on the same assumption, we conclude that the confiscation of Sternberg's prosthetic leg was not an unreasonable seizure.

"To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation and brackets omitted). Sternberg argues that the confiscation of his prosthetic leg was "a far greater intrusion than seizure of typical items of personal property" because it involved "a part of his body." The county employees respond that confiscating Sternberg's prosthetic leg was justified by legitimate security concerns. As the Court recognized in *Wolfish*, "maintaining institutional security and preserving internal order and discipline are

-23-

essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." 441 U.S. at 546.

Balancing the nature of the intrusion against the need for institutional security, we believe that the decision to confiscate Sternberg's prosthetic leg was reasonable. The prosthetic leg consisted of a mannequin-like foot, a carbon-fiber socket contoured to fit Sternberg's knee, and numerous metal parts, including two bolts near the heel, two more at the ankle, a cylindrical clamp, a receiving catch, and a stainless steel post. Constructed of hard, durable materials, the prosthetic leg was capable of supporting Sternberg's weight. Precisely because of its heavy-duty design, however, the prosthetic leg was also capable of serving as a weapon for harming others. "A detention facility is a unique place fraught with serious security dangers," *id.* at 559, and "the Government must be able to take steps to maintain security and order at the institution and make certain no weapons . . . reach detainees." *Id.* at 540. Given the potential that Sternberg's prosthetic leg could be used as a dangerous weapon, the decision to confiscate his prosthetic leg was objectively reasonable, despite the intrusion on his personal privacy. Summary judgment in favor of the county employees was therefore proper on Sternberg's Fourth Amendment claim.

B.

Sternberg also argues that the confiscation of his prosthetic leg violated the Due Process Clause of the Fourteenth Amendment. Citing *Wolfish*, 441 U.S. at 535, he contends that the confiscation constituted a deprivation of liberty without due process of law because it amounted to "punishment" prior to an adjudication of guilt. We reject this contention.

"Absent a showing of an expressed intent to punish on the part of detention facility officials," a particular condition or restriction of pretrial detention does not amount to "punishment" if it is "reasonably related to a legitimate governmental

-24-

objective." *Id.* at 538-39.  The record contains no evidence of an expressed intent on the part of county employees to punish Sternberg, and for the reasons stated above, the confiscation of his prosthetic leg was reasonably related to the legitimate governmental objective of maintaining security in the jail.  Accordingly, Sternberg's claim alleging a violation of procedural due process fails as a matter of law.

Sternberg further contends that the confiscation of his prosthetic leg violated the Fourteenth Amendment's guarantee of substantive due process.  Even if we make the unlikely assumption that substantive due process analysis is appropriate in addition to Fourth Amendment scrutiny, *cf. Graham v. Connor*, 490 U.S. 386, 394-95 (1989), Sternberg's claim cannot succeed.  The confiscation of Sternberg's prosthetic leg was justified by the need to preserve institutional security, and it was not "arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (internal quotation omitted).  Therefore, the district court did not err in granting summary judgment on Sternberg's substantive due process claim.

Sternberg asserts that the confiscation of his prosthetic leg violated the Due Process Clause of the Fifth Amendment, in addition to that of the Fourteenth Amendment.  The Due Process Clause of the Fifth Amendment, however, applies only to the federal government.  *Barnes v. City of Omaha*, 574 F.3d 1003, 1005 n.2 (8th Cir. 2009.); *see Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 250-51 (1833).  Therefore, Sternberg's Fifth Amendment claim fails as well.

IV.

We turn finally to Sternberg's claims against the County and its employees under the ADA and the MHRA.

A.

Sternberg challenges the district court's grant of summary judgment on his claim under Title II of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Sternberg asserts his Title II claim against the County and various of its employees, in their personal and official capacities. Individuals in their personal capacities, however, are not subject to suit under Title II, which provides redress only from public entities. *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc). Accordingly, summary judgment was proper on Sternberg's suit against the county employees in their personal capacities. Treating his suit against the county employees in their official capacities as a suit against the County, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991), we turn to the merits of his Title II claim against the County.

Sternberg contends that the County violated the ADA by confiscating his prosthetic leg. Although he does not dispute that he was provided a wheelchair and an ADA-compliant cell, he maintains that these measures fell short of reasonable accommodation for his disability, given the alternative of letting him use his prosthetic leg. We disagree.

To establish a violation of Title II of the ADA, Sternberg must demonstrate: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability. *See Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998). Sternberg has failed to make a showing

sufficient to establish the second element. In his deposition, Sternberg stated that he would have preferred to have had use of his prosthetic leg while he was in jail, and that if he had been given use of it, he "might have" played basketball on the jail's basketball court. Sternberg conceded, however, that playing basketball was not a "regular activity" of his. He further conceded that there was no "particular place" in the jail he "wanted to walk" using his prosthetic leg, and that he was unaware of "any program in the jail . . . that [he] wanted to participate in that [he was] not able to as a result of being in the wheelchair." Indeed, nothing in the record suggests that he was denied access to any of the benefits of the jail's services, programs, or activities during his less than forty-eight hours in custody. Because of this failure of proof concerning an essential element, the County is entitled to judgment on Sternberg's Title II claim as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

B.

Sternberg also challenges the district court's grant of summary judgment on his claim under the MHRA. The MHRA states:

> It is an unfair discriminatory practice to discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of . . . disability . . . or to fail to ensure physical and program access for disabled persons unless the public service can demonstrate that providing the access would impose an undue hardship on its operation.

Minn. Stat. § 363A.12, subd. 1.

According to Sternberg, the County and its employees engaged in "an unfair discriminatory practice" by confiscating his prosthetic leg. Sternberg has not shown, however, that he suffered any discrimination in "access to, admission to, full utilization of or benefit from" the jail. Nor has he shown that he was denied any

-27-

"physical and program access" at the jail. As noted, Sternberg admitted that there was no "particular place" where he "wanted to walk," and no particular program in which he wanted to participate but could not. Because the record does not establish any adverse treatment with respect to public services, *see City of Minneapolis v. Richardson*, 239 N.W.2d 197, 202 (Minn. 1976), the district court properly granted summary judgment for the County and its employees.

*     *     *

For these reasons, the judgment of the district court is affirmed in part and reversed and remanded in part for proceedings consistent with this opinion.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

The defendant police officers Timothy Merkel and Roderic Weber had probable cause to arrest the plaintiffs for a violation of the Minnesota disorderly conduct statute, Minn. Stat. § 609.72, subd. 1. Nonetheless, the majority reverses the district court's grant of qualified immunity to these officers on the plaintiffs' Fourth Amendment claim, holding that the officers acted contrary to a "narrowing construction" of the disorderly conduct statute – a construction that has never been adopted by the Supreme Court of Minnesota, and that has been expressly rejected by the Minnesota Court of Appeals. The majority's decision, therefore, is contrary to established principles of qualified immunity, which ensure that public officials are not subjected to suit unless they are on notice, through clearly established law, that their conduct is unlawful. I would affirm the judgment of the district court in its entirety.

I.

This case involves arrests for the misdemeanor offense of disorderly conduct. Minnesota's disorderly conduct statute provides:

Whoever does any of the following in a public or private place, . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others . . . , is guilty of disorderly conduct, which is a misdemeanor:

. . . .

(3) *engages in offensive, obscene, abusive, boisterous, or noisy conduct* or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72, subd. 1 (emphasis added). Merkel and Weber contend there was probable cause to believe that the plaintiffs had engaged in "boisterous or noisy conduct" with reasonable grounds to know that it would tend to alarm or anger others.

The majority, however, declines to analyze the existence of probable cause under the plain language of the disorderly conduct statute. Instead, the majority concludes that the police officers acted in violation of a "narrowing construction" of the statute. The court reasons that where a person is engaged in "expressive conduct," the prohibition on "boisterous or noisy conduct" in the disorderly conduct statute may be applied only to conduct that amounts to "fighting words," or to words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Ante*, at 15. And the majority further opines that this "narrowing construction" was clearly established law as of July 2006 when Merkel and Weber arrested the plaintiffs.

The majority's conclusion is incorrect. The Supreme Court of Minnesota has not announced that the disorderly conduct statute is narrowed in the manner suggested by the majority, and the Minnesota Court of Appeals has rejected contentions that the prohibition on "boisterous or noisy conduct" is limited to "fighting words." As of July 2006, therefore, Minnesota law did not clearly establish that police officers must conform their actions to a narrowing construction of the disorderly conduct statute, rather than to the statute as written.

-29-

The plaintiffs and the majority rely on the decision of the Supreme Court of Minnesota in *In re Welfare of S.L.J.*, 263 N.W.2d 412 (Minn. 1978). There, the court held that a *different clause* of the disorderly conduct statute should be narrowly construed. The court concluded that absent a narrowing construction, the statute's prohibition on "offensive, obscene, or abusive *language*" tending reasonably to "arouse alarm, anger, or resentment in others" violated the First Amendment. *Id.* at 418-19 (emphasis added). To preserve the constitutionality of the statute, the court construed that prohibition to extend only to "fighting words" – words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 419 (internal quotation omitted).

In a later decision, however, the Minnesota Court of Appeals addressed the portion of the statute at issue in this case, and held that the narrowing construction of *S.L.J.* did not apply. In *In re Welfare of T.L.S.*, 713 N.W.2d 877 (Minn. Ct. App. 2006), filed just ten weeks before the arrests in this case, the court of appeals considered the statute's prohibition on "offensive, obscene, abusive, boisterous, or noisy *conduct*." Minn. Stat. § 609.72, subd. 1(3) (emphasis added). The question in that case was whether police officers had probable cause to arrest for disorderly conduct a student who shouted profanities at police officers inside a school. The court acknowledged that the profanities *did not* constitute "fighting words," 713 N.W.2d at 881, but explained that the *S.L.J.* decision "addressed only that portion of the statute that criminalized 'offensive, obscene, or abusive *language*.'" *Id.* at 880 (quoting Minn. Stat. § 609.72, subd. 1(3)) (emphasis added). The court concluded that "[a]lthough the disorderly conduct statute prohibits only 'fighting words' as applied to speech *content*, the disorderly shouting of otherwise protected speech or engaging in other 'boisterous or noisy *conduct*' may still trigger punishment under the statute without offending the First Amendment." *Id.* at 881. The court thus applied the statute's prohibition on "conduct" without a narrowing construction, and held that the officers had probable cause to arrest the student. *Id.* The court reiterated this conclusion in *Craig v. State*, No. A07-1949, 2008 WL 5136170 (Minn. Ct. App. Dec.

9, 2008), where it assumed for purposes of analysis that the defendant's conduct merited First Amendment protection, and then rejected a contention that the "fighting words" limitation of *S.L.J.* should be extended to "conduct" governed by the disorderly conduct statute. *Id*. at *3-4.

The majority mischaracterizes *T.L.S.* as establishing only that the disorderly conduct statute may be applied to "boisterous and noisy *non-expressive* conduct." *Ante*, at 14. The decision of the Minnesota Court of Appeals was not so limited. Rather, the court explained that even where a person is engaged in expressive conduct or speech, it is constitutional to prohibit the objectionable manner in which that expression is communicated: "[T]he disorderly shouting of *otherwise protected speech* or engaging in other 'boisterous or noisy *conduct*' may still trigger punishment under the statute without offending the First Amendment." *T.L.S.*, 713 N.W.2d at 881 (first emphasis added). No narrowing construction was necessary, the court concluded, because "it is not the speech itself that triggers punishment; the statute may be applied to punish *the manner of delivery* of speech when the disorderly nature of the speech does not depend on its content." *Id.* (emphasis added). *Accord Craig*, 2008 WL 5136170, at *3-4.[2]

---

[2]That a State may regulate the manner in which expression is delivered, without regard to content, is well established. The Supreme Court long ago held, for example, that enforcement of a New Jersey ordinance that prohibited sound trucks from broadcasting in a "loud and raucous manner" did not violate the First Amendment rights of an operator who used the sound apparatus to engage in expressive conduct by commenting on a labor dispute. *Kovacs v. Cooper*, 336 U.S. 77, 79, 88-89 (1949) (plurality opinion); *id*. at 96-97 (Frankfurter, J., concurring); *id*. at 97-98 (Jackson, J., concurring); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 790, 796 (1989) (concluding that "it can no longer be doubted that government has a substantial interest in protecting its citizens from unwelcome noise," even in "such traditional public forums as city streets and parks," and even with respect to music, "one of the oldest forms of human expression") (internal quotation and bracket omitted); *Carew-Reid v. Metro. Transp. Auth.*, 903 F.2d 914 (2d Cir. 1990) (upholding regulation banning use of amplifiers by musicians on New York City subway platforms).

Because *T.L.S.* represents the best evidence of the meaning of Minnesota law, *see West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940), the district court properly rejected the plaintiffs' argument that the portion of the disorderly conduct statute concerning boisterous or noisy conduct has been narrowly construed. Under Minnesota law, blaring music on a public sidewalk, in close proximity to pedestrians, in a noisy and boisterous manner may constitute disorderly conduct, whether the sound is an anti-consumerism message, fighting words, or the Iowa fight song. At a minimum, at the time of these arrests, the law was not clearly established that the police officers were required to disregard the interpretation of the Minnesota Court of Appeals in *T.L.S.*, and instead to comply with a narrowing construction that has never been adopted by the Minnesota courts.

The majority seeks to bolster its conclusion by reference to a decision of the Supreme Court of Minnesota that declared invalid as contrary to the First Amendment an entirely different statute concerning "harassment." *State v. Machholz*, 574 N.W.2d 415 (Minn. 1998). The harassment statute was not limited to "boisterous or noisy conduct," so *Machholz* is inapposite. Surely an objectively reasonable police officer, enforcing the disorderly conduct statute in July 2006, was entitled to rely on a decision of the Minnesota Court of Appeals from May 2006 interpreting the disorderly conduct statute rather than a decision of the Supreme Court of Minnesota from 1998 interpreting a felony harassment statute.

II.

Under the disorderly conduct statute as written and interpreted by the Minnesota courts, Merkel and Weber had probable cause to arrest the plaintiffs. As the majority explains, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Five courts of appeals, moreover, have held that an

officer's authority to arrest for misdemeanors is not limited by any constitutional requirement that the offense be committed in the presence of the officer, or that the arrest occur promptly after the commission of the offense. *Woods v. City of Chi.*, 234 F.3d 979, 995 (7th Cir. 2000); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Fields v. City of S. Houston*, 922 F.2d 1183, 1189 (5th Cir. 1991); *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990); *Street v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974); *see also Welsh v. Wisconsin*, 466 U.S. 740, 756 (1984) (White, J., dissenting) (concluding that "the requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment"); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 5.1(c), at 30 (4th ed. 2004) (concluding that "the presence test is not mandated by the Fourth Amendment"); *cf. Atwater*, 532 U.S. at 340 n.11 ("We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests."). For purposes of qualified immunity, therefore, an officer making an arrest for a misdemeanor offense cannot be liable for violating clearly established rights under the Fourth Amendment as long as the officer had probable cause (indeed, even "arguable" probable cause, *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)), that the arrestee committed an offense.

The disorderly conduct statute applies to persons who engage in "boisterous, or noisy conduct . . . tending reasonably to arouse alarm, anger, or resentment in others," Minn. Stat. § 609.72, subd. 1(3).[3] Minnesota courts have interpreted this

---

[3]Although the phrase "tending reasonably to arouse alarm, anger, or resentment in others" immediately follows the phrase "offensive, obscene, or abusive *language*," the Minnesota courts apparently read the "tending reasonably to arouse" clause also to modify the portion of the statute concerning "offensive, obscene, abusive, boisterous, or noisy conduct." *E.g.*, *Craig*, 2008 WL 5136170, at *4. In any event, the opening clause of the subdivision makes clear that conduct violates the statute only if the person knows, or has reasonable grounds to know, that it will, or will tend to, alarm, anger or disturb others. Minn. Stat. § 609.72, subd. 1.

language to require only that the conduct be "likely" to have the proscribed effect. *State v. Soukup*, 656 N.W.2d 424, 428 (Minn. Ct. App. 2003). No actual commotion need occur. *Id.*

Here, Merkel and Weber knew that someone had called 911 to report the plaintiffs' conduct. The caller described the plaintiffs as "playing loud music from a boombox," giving the officers reason to believe that the plaintiffs' conduct was boisterous and noisy. The caller also stated that the plaintiffs were "calling themselves zombies and almost touching people," suggesting further that their conduct was offensive. That the caller felt moved to dial 911 indicated that the plaintiffs' conduct already had aroused alarm, anger, or resentment in at least one person (namely, the caller herself), and was likely to arouse such feelings in others, given the crowds downtown for the Aquatennial festival.

Police officers themselves observed conduct similar to what the 911 caller described. When Officers James Archer and Chad Martin arrived near the intersection of South Seventh Street and Nicollet Mall, they saw and heard the plaintiffs playing music over the speakers of their sound system, and witnessed them "coming up close to people." They saw the plaintiffs dancing to the music while pretending to be zombies, their faces covered with makeup and fake blood. With the caller's account of people "playing loud music from a boombox," "calling themselves zombies," and "almost touching people" largely substantiated, the officers advised the plaintiffs to turn down the volume and stay away from bystanders.

Merkel and Weber were entitled to rely on the information contained in the 911 call and the observations made by Archer and Martin. *See Draper v. United States*, 358 U.S. 307, 311-12 (1959) (holding that hearsay may be considered in determining the existence of probable cause, even if it would not be admissible in a criminal trial); *White v. United States*, 448 F.2d 250, 254 (8th Cir. 1971) ("[I]n determining whether probable cause existed we must evaluate the collective information of all the

officers.") (internal quotation omitted). The officers knew collectively that the plaintiffs played music loudly over their speakers on downtown streets while an outdoor festival was ongoing, that they were "coming up close to people," and that someone called 911 to complain that they were loud and almost touching people. These facts were sufficient to warrant a reasonable person of caution in the belief that the plaintiffs engaged in boisterous or noisy conduct that was likely – and that the plaintiffs had reasonable grounds to know was likely – to arouse alarm, anger, or resentment in others.

It is true that the officers did not arrest the plaintiffs until after they suspected that the plaintiffs were affiliated with a violent gang, and by that time, the plaintiffs were neither dancing nor playing music. Probable cause to believe that the plaintiffs engaged in disorderly conduct, however, did not dissipate in the time between their initial encounter with police and their arrests. *See United States v. Watson*, 423 U.S. 411, 449 (1976) (Marshall, J., dissenting) ("Unlike probable cause to search, probable cause to arrest, once formed will continue to exist for the indefinite future, at least if no intervening exculpatory facts come to light.") (citing cases); *United States v. Bizier*, 111 F.3d 214, 219 (1st Cir. 1997). That the officers may have been motivated to make the arrests by matters unrelated to the plaintiffs' conduct, such as concerns about possible gang affiliation, is also immaterial to the Fourth Amendment analysis. "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

While the arrests in retrospect may seem unnecessary and ill-advised, that does not mean that they were in violation of clearly established constitutional rights. Nor should this legal conclusion arouse fears that the jails of Minneapolis will be filled with people who play loud music on sidewalks. The Supreme Court in *Atwater* observed that "the country is not confronting anything like an epidemic of unnecessary minor-offense arrests," 532 U.S. at 353, and there is nothing in the record of this case to suggest that Minneapolis is any different. It is reasonable to presume

that judgment and discretion typically lead officers to resolve probable cause concerning disorderly conduct – like probable cause concerning the seat belt violation in Texas at issue in *Atwater* – with warnings or citations. In this case, it appears that Merkel and Weber were prepared to forgo arrests until they were apprised of intelligence reports concerning a gang known for wearing face paint, and the plaintiffs were then unable to provide identification that would dispel concerns about possible gang activity. For better or worse, these later developments informed the officers' exercise of discretion about how to respond to the preexisting probable cause. An arguably poor exercise of discretion, however, must be distinguished from a violation of clearly established rights under the Fourth Amendment. The district court properly dismissed the plaintiffs' claim alleging an unconstitutional seizure.

The existence of probable cause to believe that the plaintiffs engaged in disorderly conduct was constitutionally sufficient to justify their detention between the arrests on Saturday night and their release on Monday. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991). Thus, the district court did not err in granting summary judgment in favor of the officers on the plaintiffs' Fourth Amendment claim.

III.

I concur in the majority's judgment rejecting plaintiffs' claim that they were seized in retaliation for exercising their First Amendment right of free speech. To prevail on their claim of retaliation, the plaintiffs must show an absence of probable cause for their seizures. *Cross v. Mokwa*, 547 F.3d 890, 896-97 (8th Cir. 2008); *Smithson v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir. 2000). Because there was probable cause to believe that the plaintiffs committed the offense of disorderly conduct under Minnesota law, summary judgment was appropriate on the plaintiffs' First Amendment retaliation claim.

I also concur in the judgment affirming the district court's dismissal of the plaintiffs' claim that the officers committed the state-law tort of false imprisonment. Under Minnesota law, "if an arrest is made without proper legal authority, it is a false arrest, and so false imprisonment." *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (Minn. 1974). An arrest for a misdemeanor conforms to Minnesota law as long as police officers, in their presence, have observed conduct giving rise to probable cause to believe that the offense was committed. *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990); *Henry v. Comm'r of Pub. Safety*, 357 N.W.2d 121, 122-23 (Minn. Ct. App. 1984); *see* Minn. Stat. § 629.34, subd. 1(c)(1). The plaintiffs argue that their arrests were made without proper legal authority because probable cause did not exist to believe that they committed any offense.

The facts of the seizures outlined above, even without considering the 911 call that prompted the investigation, were sufficient to establish probable cause to believe that the plaintiffs engaged in disorderly conduct in the presence of officers. As noted, the officers themselves observed conduct similar to what the 911 caller described, including that the plaintiffs were playing music over the speakers of their sound system, dancing to the music with their faces covered with makeup and fake blood, and "coming up close to people." The district court thus did not err in granting summary judgment on the claim of false imprisonment.

Finally, I concur in Parts III and IV of the opinion of the court. The judgment of the district court should be affirmed.

_____