# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3134

_____

Devin Kilpatrick,      *
     *
         Plaintiff-Appellant,      *
     *
Ronda Conn,      *
     *   Appeal from the United States
         Plaintiff,      *   District Court for the District of
     *   Nebraska.
      v.      *
     *
Pat King; Kathy Carter; Ron      *
Ross; Steven N. Wilson; Holly Brandt,      *
     *
         Defendants-Appellees.      *

_____

Submitted: June 11, 2007
Filed: August 22, 2007

_____

Before MELLOY, SMITH, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff Devin Kilpatrick brought multiple claims pursuant to 42 U.S.C. § 1983 against several employees of the Nebraska Department of Health and Human Services ("HHS"), including a claim that defendants Holly Brandt, Kathy Carter, and Steven Wilson took adverse action against him in retaliation for his exercise of constitutional rights. During discovery, Wilson asserted attorney-client privilege and refused to

answer certain questions relating to his communications with an HHS attorney. Kilpatrick moved to compel Wilson to answer those questions. The district court[1] denied the motion and subsequently granted summary judgment to all defendants. Kilpatrick appeals the denial of his motion to compel discovery and the grant of summary judgment on his retaliation claim. We affirm.

## I.  BACKGROUND

### A.     Initial Proceedings

Devin Kilpatrick and Ronda Conn ("Ronda") married in 1999.  Thereafter, Kilpatrick, Ronda, and J.B., Ronda's son from a previous marriage, lived together in Scottsbluff, Nebraska.  Ronda's mother, Shirley Conn ("Shirley"), also lived in Scottsbluff, and she served as a frequent babysitter for J.B.

In the spring of 2002, Shirley took J.B. to an appointment with Dr. Bart Mueller, one of J.B.'s physicians.  Shirley told Mueller that J.B. had claimed that Kilpatrick had punched him hard enough to cause a nosebleed.  Mueller saw no signs of facial injuries.  As required by Nebraska law, Mueller called local law enforcement officials to report the suspected child abuse of J.B., who was then ten years old.  Local authorities notified HHS case worker Jolie Becker, who investigated the report.  J.B. recanted the story after Ronda and Shirley confronted him, and Becker ultimately concluded that the allegation was unfounded.  The Scotts Bluff County Attorney's Office did not file charges against Kilpatrick or seek to remove J.B. from his care.

---

[1]The Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

On August 13, 2002—less than six months later—HHS case worker Pat King received a phone call at home from Jody Eckhardt, Ronda's cousin. Eckhardt told King that J.B. had bruises from being beaten by Kilpatrick. King immediately contacted the local police, and Scottsbluff police officer Steven Lopez arrived at Shirley's home, where J.B. had gone following the alleged beating. Lopez noted that J.B.'s eyes and lips were bruised and swollen, and J.B. had other bruises on his forearm, shoulder, chest, and ankle. After riding to the police station with Shirley, J.B. told Lopez that Kilpatrick had punched him several times.

Lopez drove to the home of Kilpatrick and Ronda and arrested Kilpatrick. At the police station, Kilpatrick admitted to striking J.B. on prior occasions for disciplinary purposes and to spanking J.B. earlier that day. Kilpatrick maintained that he did not cause the bruises on J.B.'s face, however, and suggested that those injuries may have been self-inflicted. When Lopez told Ronda that Kilpatrick believed J.B. had caused the bruises himself, Ronda shook her head and stated, "No." Ronda immediately petitioned the District Court of Scotts Bluff County for a domestic abuse protection order against Kilpatrick, but she voluntarily vacated the protection order two days later.

King and Nan Carver, another HHS case worker, investigated the matter for HHS. Carver accompanied Ronda and J.B. on a visit to one of J.B.'s physicians on the day Ronda filed for the protection order, and Carver noted that Ronda disbelieved J.B.'s story of abuse. On August 16, King interviewed J.B. and Shirley, and King informed Ronda that HHS would file a petition to remove J.B. from her custody due to her failure to protect him from Kilpatrick's abuse. King also warned Ronda that "if she supported [Kilpatrick], she would lose [J.B.]." The following day, Scottsbluff police officer Ken Webber conducted a formal follow-up interview with Ronda. J.B. suffered from attention-deficit/hyperactivity disorder, and Ronda told Webber that she had seen J.B. hit himself before (though he had never caused himself physical injuries as extensive as those displayed on August 13). Shortly thereafter, the Scotts Bluff

County Attorney's Office initiated proceedings to remove J.B. from the care of Ronda and Kilpatrick. Ronda filed for divorce.

The county attorney indicted Kilpatrick on felony child abuse charges, and the case went to trial in December 2002. Kilpatrick submitted medical evidence that J.B. was prone to over-dramatizing events to receive attention from Ronda and that J.B. had engaged in self-abuse in the past. A jury acquitted Kilpatrick of all charges. The county attorney subsequently dismissed the parallel custody suit to remove J.B. from the care of Ronda and Kilpatrick, and J.B. was returned to Ronda.

## B. Investigation and Lawsuit

Vindicated in state proceedings, Ronda and Kilpatrick soon began raising complaints regarding HHS's handling of J.B.'s allegations. Counsel for the now-divorced couple successfully sought the appointment of a special county prosecutor to investigate King's behavior in the case, particularly whether King engaged in criminal witness tampering when she cautioned Ronda against supporting Kilpatrick. Ronda and Kilpatrick made comments critical of King and HHS that were published in a series of newspaper articles appearing in the *Omaha World-Herald* and the *Scottsbluff Star-Herald* in the spring of 2003. Following publication of the articles, HHS began its own internal investigation of King's conduct and reassigned her to different office duties. On July 15, 2003, the special prosecutor issued a press release stating that he would not file criminal charges against King. The special prosecutor noted that, while "Ms. King's actions push[ed] the envelope and c[a]me close to crossing the line" of legality, the context of King's statement to Ronda indicated that it was likely made to explain the consequences of testifying falsely regarding known abuse, rather than to coerce Ronda into testifying falsely or to chill her from testifying truthfully. The HHS internal investigation concluded the next day, finding that King's conduct in the J.B. case was proper and that her comment to Ronda was not inappropriate. King immediately returned to normal duties.

Kilpatrick then took legal action.[2] On August 6, 2003, he filed a lawsuit against King and HHS alleging that the defendants' conduct in handling J.B.'s allegations violated Kilpatrick's Fourth, Sixth, and Fourteenth Amendment rights, 42 U.S.C. § 1983, and that the defendants conspired to violate his civil rights, 42 U.S.C. § 1985. One month later, Kilpatrick amended his complaint to add two new defendants: HHS director Ron Ross and Kathy Carter, one of King's supervisors in the Gering, Nebraska HHS office. The discovery process was slow, due in large part to HHS's evasive and non-responsive answers to some of Kilpatrick's interrogatories. On April 28, 2004, Kilpatrick filed a motion to compel HHS to give complete responses to those interrogatories, which the district court granted.

C. Placement on Central Register

In the spring of 2004, Carter instructed HHS protection and safety supervisor Holly Brandt to "clean up" the open files on roughly 200 to 250 old cases, a grouping that included the Kilpatrick case. This task involved reviewing the files to make one of four possible "case status determinations": (1) "unfounded," meaning that the evidence indicates that no abuse or neglect took place; (2) "inconclusive," meaning that a preponderance of the evidence shows that abuse or neglect occurred, but there was no judicial substantiation of the allegations; (3) "court-substantiated," meaning that a court has found that the child at issue was the victim of abuse or neglect; and (4) "unable to locate," meaning that HHS cannot find the subjects of an allegation. If HHS classifies a case as "inconclusive" or "court-substantiated," it must place the names of the alleged perpetrators on Nebraska's Child Central Register of Abuse and Neglect ("the Register"). Neb. Rev. Stat. § 28-718. Listings on the Register are not available to the general public, although some child-care agencies have direct access

---

[2]Ronda was a plaintiff in the lawsuit, as well. She is not a party to this appeal, however, and therefore we discuss the case solely in light of Kilpatrick's claims.

to such listings. Other law-enforcement and child-care-related agencies may inquire as to whether a particular individual is listed on the Register by requesting that information from HHS. In addition, HHS will provide such information to any other agency or organization that obtains written consent from the subject of the inquiry.

Brandt was familiar with the Kilpatrick file. She served as King's immediate supervisor in the Gering office, and she had participated in the internal investigation that cleared King of wrongdoing in the matter. She was aware that Kilpatrick had been acquitted of felony child abuse, though she had neither attended the trial nor obtained transcripts of the proceedings. After a five- to ten-minute discussion, Brandt and Carter agreed that the Kilpatrick case warranted an "inconclusive" finding. On May 5, 2004, they notified Kilpatrick by mail of this case status determination and his placement on the Register, as well as his right to request expungement from the Register.

Kilpatrick immediately exercised that right. In a written expungement request, Kilpatrick reminded the agency that he had been acquitted of the criminal charges relating to J.B.'s allegations and stated that he considered his placement on the Register to be a retaliatory act that he would include in his lawsuit. Shortly after requesting expungement, Kilpatrick amended his complaint to include a claim that HHS employees placed his name on the Register in retaliation for his complaints about King, his critical comments about King and HHS to news reporters, and the act of filing his lawsuit against several HHS employees.[3]

Steven Wilson, an HHS protection and safety program specialist, received the expungement request. Wilson reviewed materials in the HHS case file on Kilpatrick, including police reports, the HHS investigative report, King's initial assessment of the

---

[3]Shortly before Kilpatrick filed this amended complaint, the district court dismissed HHS as a defendant on the basis of sovereign immunity.

allegations, materials relating to the internal investigation of King's conduct, and photos showing J.B.'s injuries. Wilson did not review the transcript of Kilpatrick's criminal trial. Upon noting that Kilpatrick had filed a lawsuit against HHS employees, Wilson discussed the matter with Robert Wheeler, a special assistant attorney general for Nebraska and counsel for HHS. Wheeler, who had represented King in a deposition relating to Kilpatrick's criminal trial, discussed the decision with Wilson and recommended denying expungement. Wilson acted upon Wheeler's recommendation and denied Kilpatrick's expungement request in a letter dated July 8, 2004. The letter stated that "[n]o reason was found to expunge," and it informed Kilpatrick of his right to appeal the expungement denial within the agency.

Kilpatrick appealed the decision to an HHS hearing officer. As the hearing date approached, Wilson sent an email to HHS deputy administrator Chris Hanus that described the facts of the case and concluded: "In reviewing the file, this appears to me to be one of the better cases for an entry of inconclusive. Of course, my experience is that inconclusive [determinations] are difficult [to defend] at [a] hearing, but his is one that deserves our efforts." Kilpatrick filed a motion asking the HHS hearing officer to summarily expunge his name from the Register. HHS resisted this motion in a reply brief submitted by Wheeler. One section of the reply brief reads as follows:

> The Appellants allege in paragraph 3 of their Motion that the Department has listed them on the register in retaliation for their actions against the Department. That issue is pending before the Federal District Court. The hearing officer has no authority to consider that issue except as it may relate to the ultimate issue in this contested case of whether the entries are maintained appropriately and consistent with the law. To that extent, the Department responds.

> As the Appellants' attorney acknowledges in her motion, they early took their complaints to the news media. There they began a public attack on the worker and the Department, and they have maintained their

attacks in the media and in several other forums. They attacked the work and integrity of the protection and safety worker assigned to the case, and they demanded that the Department undertake an internal investigation of the worker. They demanded the Department's considered attention and investigation of the matter. They have received it. And the result is this listing. The Department submits that the facts demand and support the listing.

HHS eventually expunged Kilpatrick's name from the Register, although it did not reach this decision until April 2006.

D.  Litigation Following Kilpatrick's Addition of the Retaliation Claim

The defendants moved to dismiss each of Kilpatrick's claims as presented in his second amended complaint, and the district court ruled on this motion on March 30, 2005. It dismissed the bulk of Kilpatrick's claims, but allowed two claims to survive: (1) Kilpatrick's claim of retaliation by HHS employees for the exercise of his constitutional rights, and (2) his claim that they violated procedural due process with regard to Kilpatrick's family liberty rights. Kilpatrick then filed a third amended complaint containing those remaining claims and adding Wilson and Brandt as defendants.

Discovery battles continued, resulting in more motions to compel discovery and multiple monetary sanctions against the defendants. The last of these motions came in November 2005, shortly after the defendants had moved for summary judgment on the basis of qualified immunity. Kilpatrick moved for and was granted an extension of time to respond to the motion for summary judgment, and he thereafter deposed Wilson regarding the decision to deny expungement. During the deposition, counsel for Kilpatrick asked Wilson whether he and Wheeler discussed Kilpatrick's acquittal of criminal charges. Counsel for Wilson objected, arguing that Wilson's communications with Wheeler were protected by attorney-client privilege. Counsel

for Kilpatrick then asked Wilson several questions relating to the expungement decision, each time inviting Wilson to assert privilege. Wilson accepted these invitations not to answer. Some of the questions prompting Wilson's assertion of the privilege appear below:

> Q.: I would like to know what all of the evidence was that supported your decision . . . that a preponderance of the evidence showed in your opinion abuse. Are you going to give me that information, or are you going to assert privilege?
>
> A.: Assert privilege.
>
> . . . .
>
> Q.: Are you going to tell me specifically how you believe that [Kilpatrick] posed a future risk to vulnerable children, or are you going to assert privilege?
>
> A.: Assert privilege.
>
> . . . .
>
> Q.: Even if you truly believe in your heart that [Kilpatrick] and Ronda did 100 percent of what they were accused of having done, why not exercise the discretion [to] expunge them knowing that [Kilpatrick] and [J.B.] are unlikely to ever come into contact again? Or are you going to claim privilege for that as well?
>
> A.: I will claim the privilege for that as well.
>
> . . . .
>
> Q.: Then we go to the next sentence [of Wilson's email to Hanus] . . . . [W]hy does "this case deserve our efforts"? Or are you going to use the privilege on that one too?

A.:    Privilege.

In his motion to compel discovery, Kilpatrick argued only that Wilson should have answered the questions because the attorney-client privilege does not extend to attorney-client communications sought for the purpose of effectuating a crime or fraud. The district court found the crime-fraud exception inapplicable and denied Kilpatrick's motion to compel Wilson's testimony on these matters on February 13, 2006.[4]

The district court granted the defendants' motion for summary judgment on August 1, 2006. As to Kilpatrick's procedural due process claim, the district court determined that King lacked direct involvement in the temporary removal of J.B. from the care of Ronda and Kilpatrick and that there was no evidence that a reasonable official in her position would have known that her conduct could have violated the alleged due-process right to family integrity. As to the retaliation claim, the district court found that Carter, Brandt, and Wilson were the only defendants with personal involvement in the decisions to place and keep Kilpatrick on the Register. According to the district court, Kilpatrick had not presented sufficient evidence to allow a reasonable jury to conclude that retaliatory motives informed the relevant decisions of those defendants. Therefore, the district court granted summary judgment to the defendants.

Kilpatrick now appeals the denial of his motion to compel Wilson's testimony and the grant of summary judgment against him on his retaliation claim. We address these issues below.

---

[4]We are not convinced that these questions actually implicate the attorney-client privilege or that they could not have been rephrased to avoid any privilege problems. That issue is not before us, however. Like the district court, we decide only the questions presented by the parties—in this instance, whether the crime-fraud exception applies to the facts at hand.

## II. DISCUSSION

### A. Attorney-Client Privilege

We review the denial of a motion to compel discovery for gross abuse of discretion. Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 565 (8th Cir. 1997). Kilpatrick's only argument—both before the district court and on appeal—was that Wilson lost the benefit of the attorney-client privilege because he sought Wheeler's advice to further a crime or fraud (presumably the alleged conspiracy to retaliate against Kilpatrick as punishment for Kilpatrick's exercise of his constitutional rights). The crime-fraud exception to otherwise privileged attorney-client communications applies to "communications made for the purpose of getting advice for the commission of a fraud or crime." United States v. Zolin, 491 U.S. 554, 563 (1989) (quotation omitted). If a deponent refuses to answer a question on the basis of attorney-client privilege, and the party urging discovery seeks to compel an answer on crime-fraud exception grounds, that party must make a threshold factual showing that the exception applies; in other words, the party urging discovery must present facts warranting a reasonable belief that the deponent obtained legal advice to further a crime or fraud. In re BankAmerica Corp. Sec. Litig., 270 F.3d 639, 642 (8th Cir. 2001). If the party makes that threshold showing, the district court may review the allegedly privileged materials or hear the allegedly privileged testimony *in camera* provided such action is warranted by the circumstances of the case and the information sought. Id. This review allows the district court to determine whether the crime-fraud exception applies without breaching the confidentiality of attorney-client communications.

Here, the district court did not conduct an *in camera* examination of Wilson because it found that Kilpatrick had not met his burden of presenting a factual basis to support his belief that Wilson obtained advice from Wheeler in furtherance of any alleged retaliation against Kilpatrick. The district court did not grossly abuse its

discretion in making this determination. Wilson's stated reason for obtaining Wheeler's advice—that the subject of the expungement request was involved in pending litigation against several HHS employees—is reasonable under the circumstances and does not raise any inference of fraudulent intent. Furthermore, Wilson had the sole discretion to deny the expungement request with or without Wheeler's advice, and Wilson was well-aware of the procedures for doing so. As such, it is unclear what advice Wilson could have sought from Wheeler that would have furthered any scheme to retaliate against Kilpatrick. See id. ("Because the attorney-client privilege benefits the client, it is the client's intent to further a crime or fraud that must be shown."). Kilpatrick has offered no answer to this fundamental question, and we can discern none from the circumstances of the case. Therefore, the district court properly found the crime-fraud exception inapplicable on these facts. Because the crime-fraud exception is the only ground Kilpatrick raised for compelling Wilson's answers, we find that the district court did not grossly abuse its discretion in denying Kilpatrick's motion to compel Wilson's testimony.

### B. Retaliation Claim

We review a grant of summary judgment de novo, viewing the record in the light most favorable to the non-movant. Parks v. City of Horseshoe Bend, 480 F.3d 837, 839 (8th Cir. 2007). Summary judgment is appropriate when there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "An issue is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." Parks, 480 F.3d at 840 (quotation omitted).

"Qualified immunity protects government officials from the costs of trial and the burdens of broad discovery unless their discretionary acts violated clearly established statutory or constitutional rights." Wilson v. Northcutt, 441 F.3d 586, 590 (8th Cir. 2006). A citizen's right to exercise the constitutional freedoms to speak and to seek judicial relief without facing retaliation from government officials is clearly

established.  See id. at 592; Pendleton v. St. Louis County, 178 F.3d 1007, 1011 (8th Cir. 1999).  In this case, then, the only issue is whether a reasonable jury could find that Brandt, Carter, and Wilson actually violated that right when they placed and retained Kilpatrick on the Register.  The resolution of this inquiry depends upon the defendants' motives for making the official decisions at issue.  To avoid an adverse grant of summary judgment, Kilpatrick must present "affirmative evidence from which a jury could find" that his constitutionally protected conduct informed the defendants' decisions and caused them to place and retain his name on the Register. Crawford-El v. Britton, 523 U.S. 574, 600 (1998); see Osborne v. Grussing, 477 F.3d 1002, 1005 (8th Cir. 2007) ("To prevail in an action for First Amendment retaliation, [the] 'plaintiff must show a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury.") (quoting Hartman v. Moore, 126 S. Ct. 1695, 1703 (2006)).  Retaliation need not have been the sole motive, but it must have been a "substantial factor" in those decisions.  Wishnatsky v. Rovner, 433 F.3d 608, 613 (8th Cir. 2006).  Furthermore, the plaintiff must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was "singled out" for adverse treatment because of his exercise of constitutional rights.  Osborne, 477 F.3d at 1006 (quotation omitted).

Kilpatrick argues that a number of facts and circumstances, taken together, could allow a reasonable jury to find that the defendants intended to retaliate against him for his criticism of HHS and several of its employees.  First, he contends that his placement on the Register was the product of decisions that were both wrong and wrongly reached.  According to Kilpatrick, a preponderance of the evidence did not support the conclusion that he abused J.B., and the defendants who purported to believe otherwise drew their conclusions quickly and carelessly, showing willful blindness toward evidence that cast doubt upon the truth of J.B.'s allegations.  They did not give significant weight to the jury's finding of not guilty on a "reasonable doubt" standard of proof, examine the trial transcripts, or engage in any investigation beyond the materials they already had in their file on the case.  Kilpatrick argues that

such circumstances raise the inference that the relevant defendants were predisposed to place him on the Register, and their knowledge of his lawsuit and public criticism of HHS could have caused such prejudicial sentiment. In short, Kilpatrick asserts that the decisions were indefensible on any legitimate grounds, and therefore the relevant defendants must have been inspired by illegitimate purposes.

Adverse action that cannot be defended by any non-retaliatory explanation provides a basis for a reasonable jury to find that the defendants acted with improper motives. See Wilson, 441 F.3d at 591 ("The failures to respond to Wilson's facially legitimate complaints, to correct a harmful condition seemingly caused by Street Department incompetence, and to explain these failures to act create a reasonable inference of unconstitutional motive."). This is not such a case, however. The defendants were familiar with Kilpatrick's HHS file at the time they made their decisions. This file included documents detailing J.B.'s allegations against Kilpatrick on two occasions, photos of the injuries, police reports, and Kilpatrick's own admission that he struck J.B. on prior occasions. This evidence was strong enough to prompt the county attorney to file felony child-abuse charges against Kilpatrick. It was not strong enough for a jury to find Kilpatrick guilty of those charges beyond a reasonable doubt, but the reasonable-doubt standard is a far greater burden of proof than the preponderance-of-the-evidence standard employed by HHS in making a case status determination of "inconclusive." While the defendants may have ignored exculpatory trial evidence that supported Kilpatrick's theory that J.B. fabricated the story of abuse, there is nothing in the record to suggest that the defendants had a duty to obtain and scour the transcripts of his criminal trial to add or detract from the evidence already in their possession. From the record before us, it is difficult to conclude that the defendants' decisions were actually wrong, let alone so grossly and unjustifiably wrong as to give rise to a reasonable inference of retaliatory intent.

As noted by the district court, the timing of the decisions also weighs against an inference of retaliatory intent. At the time Kilpatrick was placed on the Register,

nine months had passed since he had filed his initial lawsuit against HHS and King. Roughly one year had passed since Kilpatrick had spoken to news reporters and urged investigation of King's conduct. Kilpatrick's criminal proceedings had concluded almost a year-and-a-half earlier. If the defendants wished to take retaliatory action in an attempt to deter Kilpatrick from exercising his constitutional rights, they could have made a case status determination and placed Kilpatrick on the Register at any time in that period. Under Kilpatrick's theory, the defendants instead suffered Kilpatrick's public criticism, his call for an investigation of their colleague, and his lawsuit, waited eight uneventful months, then finally exercised the opportunity to retaliate that had been fully available to them for a year-and-a-half. This theory is unreasonable, particularly in light of the fact that Kilpatrick presented no evidence that his case was singled out for special treatment by HHS. It was uncontested that Carter ordered Brandt to make case status determinations for the 200 to 250 files that were still open in the spring of 2004, which included Kilpatrick's file. These circumstances further reduce the reasonableness of any inference that retaliatory intent played a substantial role in Kilpatrick's case status determination.[5]

Kilpatrick points to two more pieces of evidence that arguably reveal a retaliatory intent. First, he contends that Wilson's email to Hanus, in which Wilson states that "inconclusive [determinations] are difficult [to defend] at [a] hearing, but [Kilpatrick's] is one that deserves our efforts," proves that Wilson was particularly motivated to keep Kilpatrick on the Register. This may be true, but it is unclear from the context whether that motivation arises from a desire to retaliate or a desire to retain on the Register someone who Wilson believed had remorselessly committed child

---

[5]On appeal, Kilpatrick argues that such action may have been taken in retaliation for his motion to compel complete answers to certain interrogatories. This argument lacks merit. Even if the defendants would have formed the intent to retaliate based upon a fairly routine motion that amounted to a request for more documentation, there is no evidence that Brandt or Carter had any knowledge that Kilpatrick had filed the motion at the time they made their case status determination.

abuse. Second, Kilpatrick argues that Wheeler's brief to the HHS hearing officer, in which Wheeler listed Kilpatrick's acts showing criticism for HHS employees before stating that "this listing" was the result of the attention Kilpatrick apparently sought, amounts to an admission that the defendants placed Kilpatrick on the Register to retaliate against him. Viewing the above passages in the light most favorable to Kilpatrick, as we must, they could give rise to an inference of improper motive. Looking at the evidence as a whole, however, including the timing of the decisions at issue and their legitimate factual basis, those inferences are not sufficient to create a genuine issue of fact for trial.

The bulk of Kilpatrick's case, then, rests upon attacks on the credibility of those officials who asserted legitimate motives for their decisions to place and retain his name on the Register. We are not unsympathetic to the plight of plaintiffs who bring retaliation claims that require proof of a wrongful motive, the evidence of which may be elusive or nonexistent. Nevertheless, at the summary judgment stage, "if the defendant-official has made a properly supported motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El, 523 U.S. at 600. Kilpatrick has not met this burden.

## III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____