# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-2226

_____

Susan Ackerman

*Plaintiff - Appellant*

v.

State of Iowa; Iowa Workforce Development; Teresa A. Wahlert; Teresa Hillary;
Devon Lewis; Beth Townsend; Jon Nelson

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: May 11, 2021
Filed: December 6, 2021

_____

Before COLLOTON, WOLLMAN, and KOBES, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Susan Ackerman brought retaliation, defamation, and intentional infliction of
emotional distress claims against her former employer, Iowa Workforce Development
(Workforce Development) and the state of Iowa, as well as against certain former

supervisors and coworkers.  She appeals from the district court's[1] grant of summary judgment in the defendants' favor.  We affirm.

## I. Background

Ackerman graduated from law school in 1995 and was employed as an Administrative Law Judge (ALJ) by the State of Iowa in Workforce Development's Unemployment Insurance Appeals Bureau (Bureau) from 2000 until her termination in 2015.  Ackerman sought in November 2012 to add her twenty-seven-year-old daughter Catherine Holcombe to her employer-provided health insurance plan for calendar year 2013.  At that time and all relevant times thereafter, Iowa state employees could secure employer-provided health insurance for an employee's child who was over the age of twenty-six only if the child was both unmarried and a full-time student.  Catherine was separated but not divorced from her husband and had recently moved from Hawaii to Minnesota to attend school.  Because of financial constraints, Catherine's divorce was not yet finalized.

Ackerman emailed Workforce Development Human Resources Associate Monica Reynolds, with whom she had worked for several years, to inquire whether Catherine was eligible for enrollment as an unmarried, full-time student dependent. Ackerman wrote, "I've looked at that web site for the dependent tax consequences and it seems that I can only get coverage for Cathy if she is unmarried???" Reynolds responded that she thought Catherine was unmarried, to which Ackerman replied, "No, her husband is still in Hawaii but will probably be moving back here next year." Reynolds responded, "Who has to know she is married??"  Ackerman thereafter enrolled Catherine in the health plan, through which Catherine received benefits during 2013.

---

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

Ackerman re-enrolled Catherine in the 2014 health plan during November 2013. Ackerman completed a "Full-Time Student Verification Form," on which she checked a box indicating that Catherine was not married.[2] An accompanying "Certification of Full-Time Student Status" form bearing Ackerman's signature contained the following certifying statement:

> I am providing this information to my employer for insurance enrollment and tax reporting purposes. By signing and returning this form, I certify that all of the statements above are true. . . . In addition, I certify that this full-time student is unmarried. If my full-time student's status changes, I will notify my employer immediately by submitting that information, in writing, to my Personnel Assistant.

Meanwhile, the Iowa Senate Government Oversight Committee (Oversight Committee) had launched an unrelated investigation of Workforce Development based on complaints about inappropriate political influence within its organizational structure. At the time, Workforce Development was led by Director Teresa Wahlert. Wahlert, a political appointee, directly supervised all of the ALJs, who were merit-based employees rather than political appointees or at-will employees. The organizational structure also included three "lead" ALJs, who were selected from among the existing ALJs and were responsible for streamlining work flow and overseeing policy, but held no supervisory authority. Teresa Hillary and Devon Lewis held two of the three lead ALJ positions at the time. Earlier in Wahlert's tenure, Workforce Development's organizational structure included a chief ALJ, who was a merit employee and was positioned as a buffer between the political appointee director and the ALJs.

---

[2]Ackerman contends that she also completed this form in 2012 for 2013, but Workforce Development has not located a copy from 2012, and thus it does not appear in the record.

Pursuant to the Oversight Committee investigation, five Workforce Development ALJs, including Ackerman, Hillary, and Lewis, were subpoenaed during August 2014 to testify. Ackerman stated during her testimony that she believed that Wahlert's direct supervision of the ALJs permitted political interference with their judicial independence. Hillary and Lewis testified in support of Wahlert, denying that there was improper political pressure within Workforce Development.

Wahlert testified before the Oversight Committee the next day. During the hearing, a senator inquired about Hillary's appointment to one of the lead ALJ positions despite certain professionalism concerns. Wahlert responded, "[I]n fairness, Senator, if you'd like me to bring the dirt on all the judges, I'm happy to do that. I'm happy to give you what the comments are that Bonnie . . . Hendricksmeyer had, that . . . Marlon Mormann had, that Susan Ackerman had, that any of the judges had. It's public information." Wahlert continued:

> And there are, many of [the decisions] are similar to the one, the only one you decided to read. I might also bring up that Susan Ackerman, who was over here, . . . in distress, has a finding from the US Department of Labor on attitude, bias and prejudice, and forwarded to the Law Review of one of her cases eight months ago. And three months ago, again, did not pass a Department of Labor review of one of her cases, because she did not give due process to, to the people involved in the case. So, I think singling out any one judge is probably inappropriate, I think they all have bad days, just like you have bad days, and I have bad days.

The Oversight Committee's post-hearing Findings and Recommendations included a recommendation that political appointees refrain from supervising or evaluating ALJs.

Ackerman took FMLA leave from September 11, 2014, to October 22, 2014. Following Ackerman's return, Wahlert completed Ackerman's August-scheduled

annual performance evaluation in November. Wahlert rated Ackerman as meeting expectations in five of eight review categories and as not meeting expectations in two. In the remaining category, which rated Ackerman's compliance with the United States Department of Labor's hearing and decision criteria, Wahlert checked both the "meets expectations" and "does not meet expectations" boxes. Wahlert then wrote, "Questionable—failed 1 case—and received either a fail or less than 90% on a second."[3] When Wahlert completed the "Overall Rating" section of the evaluation form, she first marked "does not meet expectations," but then scratched out that mark and checked the "meets expectations" box. Wahlert then signed and dated the form.

Shortly after her performance evaluation, Ackerman prepared to re-enroll Catherine in the 2015 health plan. The judgment finalizing Catherine's divorce had been entered on June 2, 2014, and she had reverted to using her maiden name, Brightman. Ackerman called Human Resources Associate Heather Semke to notify her that Catherine's last name had changed because of her recent divorce and that her school records would reflect the update. According to Semke, Ackerman "reiterated several times that her daughter was unmarried because she was not living with her husband in Hawaii, and she was not receiving any support from her husband." Semke testified that Ackerman's statements "made no sense" at the time, given the apparent discrepancies between previous years' "unmarried" insurance form certifications and Catherine's divorce date. Semke testified that following additional communications with Ackerman, she referred the matter to Jon Nelson, Workforce Development's

---

[3]Hillary later testified that the United States Department of Labor required regular reviews of ALJ cases. The Department of Labor randomly selected the cases to be reviewed, and fellow Workforce Development employees then performed the review by applying a numerical rating to Department-of-Labor-provided criteria. Multiple criteria related to due process. There is some dispute whether an overall passing score was 85% or 90%. Hillary testified, however, that even an ALJ who passed the review overall could still fail the due process evaluation, which was subsumed under but delineated within the overall review.

Human Resources Supervisor. Nelson thereafter informed Iowa's Department of Administrative Services (Administrative Department) about the situation to obtain Ackerman's prior health insurance enrollment forms. An Administrative Department risk and benefits manager confirmed that Catherine had been enrolled in the plan since January 2013, stated that "any attorney would know" that being separated was not the same as being unmarried, and noted that "discipline may be in order."

Ackerman was placed on paid suspension on December 11, 2014, pending a misconduct investigation. Nelson interviewed Ackerman the next day in the presence of a union representative. Ackerman averred during the interview that had she learned from Reynolds in 2012 what Semke told her in 2014, she never would have enrolled Catherine. Ackerman maintained her original position—that when she first enrolled Catherine in the 2013 health plan she believed that Catherine was properly eligible because of her marital separation and subsequent move to Minnesota. Nelson interviewed Ackerman two additional times, with a union steward present on both occasions. Nelson also interviewed Reynolds, as well as a former Administrative Department employee with whom Reynolds had allegedly spoken in 2012 to determine Catherine's eligibility.

Workforce Development's investigation concluded that Ackerman had fraudulently filed insurance enrollment forms and had deliberately falsified Catherine's marital status. As set forth in the discharge letter signed by Bureau Division Administrator Stephen Slater, Ackerman was terminated from Workforce Development effective January 30, 2015.[4] Workforce Development thereafter filed a complaint against Ackerman with the Iowa Supreme Court Attorney Disciplinary Board, which subsequently dismissed the complaint. Workforce Development also

---

[4]Wahlert resigned from Workforce Development during the pendency of the Ackerman investigation and was replaced by Beth Townsend. Ackerman alleges that Townsend made the ultimate termination decision.

-6-

referred its investigation to the Iowa Division of Criminal Investigation, which pursued criminal insurance fraud charges against Ackerman that were ultimately dismissed on statute of limitations grounds.

Ackerman filed a grievance with her union pursuant to her collective bargaining agreement. The Administrative Department investigated and denied relief. The matter was thereafter sent to arbitration. The Administrative Department arbitrator concluded that Workforce Development had just and proper cause to terminate Ackerman. Specifically, the arbitrator determined that Ackerman had received proper notice that her behavior was inappropriate, that there was substantial evidence of misconduct, that Ackerman was treated fairly and without discrimination, and that given Ackerman's position as a judge, termination was reasonably related to the seriousness of her misconduct.

Ackerman's union thereafter filed an Iowa state-court application to vacate the arbitration decision, arguing that the arbitrator evidenced partiality and that his decision was not supported by substantial evidence. The state court upheld the arbitrator's core finding—"that Ackerman knowingly lied about her daughter's marital status in order to enroll her on her health insurance plan"—concluding that it was supported by substantial evidence. The union did not appeal that determination.

Ackerman initiated this suit in January 2015 in Iowa state court, asserting that she was suspended—and later terminated—in retaliation for her testimony before the Oversight Committee and that the insurance fraud investigation constituted a mere pretext. As relevant to this appeal, she brought state retaliation and defamation claims, as well as a 42 U.S.C. § 1983 First Amendment retaliation claim. Ackerman later amended her complaint to add an intentional infliction of emotional distress

claim.[5] The defendants removed the case to federal court. Ackerman unsuccessfully attempted to dismiss her Section 1983 claim, the sole basis for federal jurisdiction, and to remand the case to state court. She then amended her complaint to add an Iowa state constitutional free speech claim.

Following depositions, the district court granted the defendants' motion for summary judgment. As relevant to this appeal, the district court determined that Ackerman had failed to show that any adverse employment action was in reprisal for her critical testimony; that Wahlert was entitled to qualified privilege and sovereign immunity on Ackerman's defamation claims; that the individual defendants were entitled to qualified immunity on Ackerman's First Amendment retaliation claim because Ackerman had failed to establish a prima facie retaliation case; that Iowa's whistleblower statute preempted Ackerman's common law intentional infliction of emotional distress claim and that she had failed to show any outrageous conduct by the defendants; and that the defendants were entitled to Eleventh Amendment immunity and "all due care" qualified immunity on Ackerman's state constitutional claim.

## II. Discussion

We review *de novo* the district court's grant of summary judgment. Holaway v. Stratasys, Inc., 771 F.3d 1057, 1058 (8th Cir. 2014). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although at summary judgment we take the record in the light most favorable to the nonmoving party, there is no genuine issue for trial when "the record taken as a whole could not

---

[5]Ackerman also added a common law wrongful discharge claim, which the district court, after removal, dismissed based on the Iowa Supreme Court's holding in Ferguson v. Exide Technologies, Inc., 936 N.W.2d 429 (Iowa 2019) (per curiam). Ackerman does not appeal this dismissal.

lead a rational trier of fact to find for the nonmoving party." Holaway, 771 F.3d at 1059 (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).

## A. Whistleblower Retaliation Claim

Ackerman argues that there exists a genuine issue of material fact regarding whether her critical Oversight Committee testimony caused her November 2014 performance evaluation, her paid suspension, and her ultimate termination, in violation of Iowa's whistleblower statute, Iowa Code § 70A.28.

Iowa's whistleblower statute protects state employees who disclose to a public official information that the employee reasonably believes "evidences a violation of law or rule, mismanagement, a gross abuse of funds, [or] an abuse of authority."[6] Id. § 70A.28(2); see also Hedlund v. State, 930 N.W.2d 707, 717 (Iowa 2019), *as amended* (Sept. 10, 2019). The parties do not dispute that Ackerman's testimony to the Oversight Committee qualifies as such protected speech. To prove she is eligible for relief under the whistleblower statute, however, Ackerman must show that she

---

[6]Section 70A.28 provides in relevant part:

A person shall not discharge an employee from or take . . . action regarding . . . a position in a state employment system administered by . . . a state agency as a reprisal . . . for a disclosure of any information by that employee to a member . . . of the general assembly . . . if the employee, in good faith, reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

Iowa Code § 70A.28(2); see also Walsh v. Wahlert, 913 N.W.2d 517, 521 (Iowa 2018) (describing this section of the Iowa code as a "151-word linguistic jungle").

suffered an adverse employment action "in reprisal" for her testimony. Smith v. Iowa State Univ. of Sci. & Tech., 851 N.W.2d 1, 34 (Iowa 2014).

We first conclude that Ackerman's 2014 performance evaluation was not an adverse employment action. Iowa law generally defines "adverse employment action" as "an action that detrimentally affects the terms, conditions, or privileges of employment. [Thus, c]hanges in duties or working conditions that cause no materially significant disadvantage to the employees are not adverse employment actions." Haskenhoff v. Homeland Energy Sols., LLC, 897 N.W.2d 553, 587 (Iowa 2017) (citation omitted). The evaluation stated that Ackerman's "[p]erformance consistently fulfills [her] job requirements and expectations" and that she was "doing the job expected for employees in [her] classification." Ackerman does not allege that her evaluation negatively affected her pay or that she would have been entitled to a pay increase had she received a better evaluation. The review neither changed Ackerman's duties or working conditions nor in any way affected the terms, conditions, or privileges of her employment.

Assuming that Ackerman's paid suspension was an adverse employment action, we conclude that she has failed to put forth evidence demonstrating that either her suspension or her termination was "in reprisal" for her critical testimony. Although the Iowa Supreme Court has not yet defined the in-reprisal-for causal standard, Ackerman must show at least some traceability between her testimony and the adverse employment action. Smith, 851 N.W.2d at 34, 36, 38.

Most of the employees involved in the investigation preceding Ackerman's paid suspension were unconnected to her testimony. Semke, who initially discovered and raised concerns about Ackerman's insurance certifications, testified that she was unaware of the Oversight Committee hearings at the time of her discovery and that she had no pre-existing opinion about Ackerman. Nelson, who signed Ackerman's suspension letter, testified that he was not involved in the Oversight Committee

-10-

hearings and had not discussed them with any Workforce Development staff. Ackerman has presented no evidence to dispute either Semke's or Nelson's testimony. Moreover, Ackerman presents no evidence that the Administrative Department's risk and benefits manager who noted that "discipline may be in order" for Ackerman's certifications was connected to Workforce Development or aware of her testimony.

In her attempt to establish the causation element, Ackerman points to Nelson's testimony that he began a misconduct investigation at Wahlert's direction; Nelson's testimony that Wahlert was likely involved in the suspension decision; and the mere few months separating Ackerman's testimony and suspension, an interval that appears to be even shorter because of her month-long FMLA leave. Ackerman, however, does not dispute Nelson's testimony that such a suspension was "usual" for an investigation of this nature. Nor does the proximity of Ackerman's testimony and suspension alone create a genuine dispute of material fact that the suspension was in reprisal for the testimony. Cf. Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 768 (Iowa 2009), *as amended on denial of reh'g* (Mar. 5, 2009) ("We have said that the timing between the protected activity and the discharge is insufficient, by itself, to support the causation element of the tort [of wrongful discharge]."); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week interval was sufficient, but barely so." (internal citations and quotation marks omitted)). Ackerman has thus not presented evidence to show that the decision to suspend her with pay was anything other than a logical response to allow time for an investigation. Her possible dishonesty raised concerns about both her ability to fulfill her ALJ duties in an ethical manner and the public's perception of the Bureau. On this record, then, we cannot say that Ackerman's paid suspension was causally related to her testimony.

We likewise conclude that Ackerman has failed to show that her termination was in reprisal for her critical testimony. Ackerman was terminated following the investigation into her insurance fraud. The investigation began only after Ackerman's insurance renewal efforts and her attempts to change Catherine's last name in the company records raised red flags within Workforce Development's human resources department. Nelson and other Workforce Development leadership interviewed Ackerman on multiple occasions, with a union representative present at each interview. Nelson also interviewed Reynolds and another former state employee to learn what Ackerman was told when she originally certified Catherine as unmarried in 2012. Workforce Development staff sifted through extensive documentation, including an email discussion in which Ackerman told Reynolds that Catherine was still married but separated from her husband. Workforce Development reasonably determined from its investigation that Ackerman had fraudulently completed insurance forms, and it then reasonably decided to terminate her based on her unethical conduct. Nelson, who led the investigation, was neither affected by nor involved in the Oversight Committee hearings. Moreover, nothing in the record shows that the three individuals whom Ackerman had criticized in her testimony—Wahlert, Lewis, and Hillary—were involved in the decision to terminate her employment. Wahlert had resigned from Workforce Development during the pendency of the Ackerman investigation. Lewis and Hillary had no authority to discipline Ackerman or terminate her employment.

Ackerman's arguments that Townsend and Slater retaliated against her by terminating her employment are unpersuasive. Ackerman avers that Townsend made the ultimate termination decision, but neither Townsend nor Slater, who was involved in the investigation and signed the termination letter, was employed by Workforce Development at the time of Ackerman's testimony. Ackerman provides no evidence that her testimony influenced these two newcomers or that they based the termination decision on anything other than the factual findings of disinterested human resources employees. Cf. Smith, 851 N.W.2d at 37 ("It is undisputed that Dr. Wickert, a

-12-

newcomer, made this decision based upon information provided by a disinterested search committee.").

We also find unavailing Ackerman's argument that we should infer reprisal because she was similarly situated to Lewis yet treated differently. Ackerman argues that she and Lewis were similarly situated because they both held ALJ positions at the Bureau, had the same supervisors, and were subject to the same professional and ethical standards as attorneys. Ackerman further contends that Lewis had engaged in the "same alleged conduct" involving dishonesty, fraud, deceit, or misrepresentation, see Iowa R. of Prof'l Conduct 32:8.4(c), but was not subjected to the same adverse employment actions. Ackerman points to Lewis's Oversight Committee testimony, during which Lewis falsely stated in response to a question that she had "never" secretly taped co-workers. Lewis apparently realized following her testimony that she in fact had once recorded a co-worker and had therefore misspoken. According to Wahlert, Lewis told Wahlert that the false statement was an oversight, and Wahlert promised to clarify Lewis's testimony. Lewis's single, quickly admitted misstatement during her Oversight Committee testimony was not the equivalent of Ackerman's repeated misstatements over several years that had enabled Ackerman to receive the inappropriate benefit of insurance for her married daughter.

We thus conclude that Ackerman has not presented evidence from which a reasonable jury could find that she was suspended or terminated in reprisal for her testimony.

## B. Defamation Claim

Ackerman next argues that neither sovereign immunity nor qualified privilege applies to her defamation per se claim against Wahlert, which arises from Wahlert's Oversight Committee testimony.

-13-

Iowa law recognizes two kinds of defamation, per quod and per se. Bandstra v. Covenant Reformed Church, 913 N.W.2d 19, 46 (Iowa 2018). To establish a defamation per quod claim, a plaintiff must prove six elements: "(1) publication, (2) a defamatory statement, (3) falsity, (4) maliciousness, (5) the statement was of or concerning the [plaintiff], and (6) a resulting injury." Id. (citation omitted). Defamation per se occurs "when a statement has a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." Id. (citation and internal quotation marks omitted). When a statement is defamatory per se, "falsity, malice, and injury are legally presumed." Id. at 46.

Tort claims brought against an Iowa state employee acting within the scope of his employment must be brought pursuant to the Iowa Tort Claims Act. Iowa Code § 669.1 et seq.; Dickerson v. Mertz, 547 N.W.2d 208, 213 (Iowa 1996). Under the Act, a state employee is entitled to sovereign immunity for otherwise defamatory statements unless they were uttered outside the scope of his employment. Godfrey v. State (Godfrey I), 847 N.W.2d 578, 583–84 (Iowa 2014); see also Iowa Code §§ 669.14(4), 669.23. A state employee acts within the scope of employment by "acting in [his] line of duty as an employee of the state." Iowa Code § 669.2(1). The Iowa Supreme Court looks to the term's common law definition to interpret "scope of employment" for sovereign immunity purposes:

> [A]n act is deemed to be within the scope of one's employment where such act is necessary to accomplish the purpose of the employment and is intended for such purpose. The question, therefore, is whether the employee's conduct is so unlike that authorized that it is substantially different.

Jones v. Univ. of Iowa, 836 N.W.2d 127, 143 (Iowa 2013) (quoting Godar v. Edwards, 588 N.W.2d 701, 705–06 (Iowa 1999)). Whether an employee was acting within the scope of his employment is ordinarily a jury question, but the question of

-14-

"whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court." Godar, 588 N.W.2d at 706.

Ackerman argues that Wahlert acted outside the scope of her employment when she testified about Department of Labor reviews of Ackerman's cases. We disagree. Wahlert testified before the Oversight Committee in her official capacity as Workforce Development Director. A senator questioned Wahlert about employee morale in the organization she led and about the failure of one of Wahlert's lead ALJs to treat people professionally. In response, Wahlert offered to "give a little context" to the senator's concerns and then testified that the Bureau had received more than ninety remands, modifications, and reversals from its superior, the Iowa Employment Appeal Board, in the preceding year. Wahlert then explained that "[e]very single judge has them" and stated that if the Oversight Committee wanted "dirt on all the judges [she was] happy to do that." She provided Ackerman's Department of Labor reviews as an example before concluding that "singling out any one judge is probably inappropriate, I think they all have bad days, just like you have bad days, and I have bad days." Wahlert's use of Ackerman as an example was "necessary to accomplish the purpose of [Wahlert's] employment," see Jones, 836 N.W.2d at 143 (citation omitted), namely, that of providing context to the Oversight Committee's concerns about Workforce Development. Moreover, Wahlert emphasized that the Ackerman example was offered only for context, because it would be "inappropriate" to single out any one judge.

Ackerman argues that Wahlert's purported direction to Lewis to assemble negative information about the ALJs prior to Wahlert's testimony establishes that Wahlert was not testifying within the scope of her employment. The record evidence shows that the evening before Wahlert's testimony, Lewis sent her an email with the subject line "Reversal Rate Record" and attached a spreadsheet listing ninety-four decisions by a variety of ALJs that had been either reversed, remanded, or modified by the Employment Appeal Board. Lewis then sent a second email to Wahlert,

attaching Lewis's Department of Labor review of one of Ackerman's cases.[7] Shortly thereafter, Lewis sent a third email containing a self-created time line of Workforce Development's ongoing organizational problems—dating back to August 2000. Lewis copied Hillary, but not their fellow Lead ALJ, on the final two emails. It was well within the scope of Wahlert's employment for her to seek and review the information contained within these emails to enable her to prepare for the testimony she was to give the next day.

No reasonable jury would find Wahlert's testimony or related actions "so unlike that authorized that it is substantially different" from the scope of her employment. See Jones, 836 N.W.2d at 143. Wahlert was thus entitled to summary judgment with respect to her allegedly defamatory testimony to the Oversight Committee. We need not decide whether her statements were also qualifiedly privileged.

## C. First Amendment Retaliation Claim

Ackerman argues that the district court erred in granting summary judgment on the basis of qualified immunity to the individual defendants—Wahlert, Hillary, Lewis, Townsend, and Nelson—on her First Amendment retaliation claim. At summary judgment, qualified immunity shields such government officials from liability in a § 1983 action "unless (1) the evidence, viewed in the light most favorable to [Ackerman], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful." Blazek v. City of Iowa City, 761 F.3d 920, 922–23 (8th Cir. 2014) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). Ackerman contends that the alleged retaliation—her paid

---

[7]Ackerman's case received an overall score of eighty-nine percent, but failed the due process evaluation.

suspension and termination—violated her clearly established First Amendment right to free speech. See Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) ("[T]he First Amendment restrains the government from retaliating against a public employee based on the employee's speech." (citation omitted)).

To establish a protected-speech retaliation claim, Ackerman must show: (1) that she engaged in First-Amendment-protected activity; (2) that the defendants "took an adverse employment action against h[er]"; and (3) that the "protected speech was a substantial or motivating factor in [the defendants'] decision to take the adverse employment action." Henry v. Johnson, 950 F.3d 1005, 1011 (8th Cir. 2020) (citation omitted). The parties do not dispute that Ackerman's testimony before the Oversight Committee constituted constitutionally protected activity.

With respect to defendants Lewis and Hillary, we conclude that Ackerman has failed to present evidence that they took an adverse employment action against her. Ackerman admitted that neither woman had authority to discipline or terminate her, and no evidence suggests that either woman directed an investigation into Ackerman's insurance coverage selections, was involved in the investigation, or contributed to the decisions to suspend and terminate Ackerman. See Hudson v. Norris, 227 F.3d 1047, 1053 (8th Cir. 2000) (no valid retaliation claim against defendant against whom plaintiff had made no specific allegations or presented any evidence).

Again assuming that Ackerman's paid suspension was an adverse employment action, we consider whether Ackerman has shown that her critical testimony was a substantial or motivating factor in the suspension and termination decisions rendered by Wahlert, Nelson, and Townsend. Although causation is generally a jury question, we must determine "if sufficient evidence exists to create a factual question for the jury." Henry, 950 F.3d at 1014 (citation omitted). To prove causation, Ackerman must first "show that [s]he suffered an adverse employment action that was causally

connected to h[er] participation in a protected activity." Id. (citation omitted). Retaliatory motive may be proved through "circumstantial evidence giving rise to an inference of retaliatory intent," Williams v. City of Carl Junction, 523 F.3d 841, 843 (8th Cir. 2008), but "more than a temporal connection . . . is required" to survive summary judgment, see Auer v. City of Minot, 896 F.3d 854, 860 (8th Cir. 2018) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). If Ackerman meets this requirement, "the burden shifts to the employer to show a legitimate, nondiscriminatory reason for his or her actions." Henry, 950 F.3d at 1014 (citation omitted). "If the employer establishes such a reason, the burden shifts back to [Ackerman] to show that the employer's actions were a pretext for illegal retaliation." Id. (citation and internal quotation marks omitted).

To show Wahlert's retaliatory intent for her paid suspension, Ackerman points to evidence that Wahlert may have requested negative information about Ackerman prior to Wahlert's Oversight Committee testimony, to Ackerman's 2014 performance review, and to the three-month time span between Ackerman's testimony and suspension. As discussed above, Wahlert's pre-testimony inquiries were properly related to that testimony. Ackerman's 2014 performance review form, on which Wahlert indicated that Ackerman was meeting expectations, was a neutral review that had no effect on Ackerman's employment and is thus not evidence of an otherwise retaliatory motive. See Spears v. Mo. Dep't of Corr. & Hum. Res., 210 F.3d 850, 854 (8th Cir. 2000) (annual performance rating of "successful" rather than "highly successful" not an adverse employment action when it was never used to the employee's detriment). Although the three-month interval between Ackerman's testimony and her suspension appears to be shorter because of her intervening FMLA leave, there is nevertheless insufficient temporal proximity to support an inference of causation. No adverse employment actions occurred during that entire time span. Contra Hudson, 227 F.3d at 1051 (a "large number of adverse actions" occurring "hard on the heels of the protected activity"—i.e., over the course of four months—created a strong inference of causation).

-18-

Moreover, the intervening discovery by unrelated employees of possible insurance fraud established an independent, non-retaliatory basis for Ackerman's paid suspension. Ackerman presents no evidence that Wahlert directed anyone in Workforce Development's human resources department to scrutinize Ackerman's personnel file for grounds on which to suspend her. See Kilpatrick v. King, 499 F.3d 759, 769 (8th Cir. 2007) (insufficient evidence to survive summary judgment when "[t]he bulk of [the plaintiff's] case . . . rests upon attacks on the credibility of those officials who asserted legitimate motives for their decisions to [engage in the allegedly retaliatory action]"). In light of the evidence that Ackerman was suspended immediately following the discovery of insurance fraud, it is thus unreasonable to infer that Wahlert obtained negative information about Ackerman in advance of testifying, waited three uneventful months, and then—only after concerns of potential misconduct—"finally exercised the opportunity to retaliate." See id., at 768; cf. Hudson, 227 F.3d at 1053 (inference reasonable in part because evidence that the reasons given for certain adverse employment actions were false). There is, at most, no more than "a simple concurrence of two events here."[8] See Hudson, 227 F.3d at 1051.

Ackerman also failed to present evidence that her termination was in retaliation for her critical testimony. As discussed above, decision-maker Townsend was not employed by Workforce Development at the time of Ackerman's testimony and was not the subject of her testimony. Ackerman provides no evidence to dispute Townsend's testimony that she never discussed Ackerman with Wahlert. Instead, Townsend was briefed about Ackerman's potential insurance fraud by Nelson, who was unconnected to Ackerman's critical testimony, and by Slater, who was not employed by Workforce Development at the time of Ackerman's testimony. The only

---

[8]To the extent Nelson may have been involved in the suspension decision, Ackerman also has not shown any causal connection to her critical testimony. As set forth above, Nelson had no involvement in the Oversight Committee hearings and had not discussed them with anyone at Workforce Development.

evidence to which Ackerman points is the fact that the termination occurred five months after her Oversight Committee testimony. This tenuous temporal connection is insufficient to create a causation question for the jury to decide, however. See Auer, 896 F.3d at 860 (quoting Kiel, 169 F.3d at 1136). Any "general attacks" on Townsend's credibility are likewise insufficient to prove improper motive, and Ackerman has failed to "identify affirmative evidence from which a jury could find" that Townsend acted with retaliatory intent. See Kilpatrick, 499 F.3d at 769 (quoting Crawford-El v. Britton, 523 U.S. 574, 600 (1998)). Given that the discovery of Ackerman's insurance fraud "occurred even closer in time" to her termination, "an obvious alternative explanation for the decision exists" and "there is no basis for disturbing the district court's grant of summary judgment."[9] See Auer, 896 F.3d at 860–61.

Assuming, however, that Ackerman has proved retaliatory intent, Ackerman's insurance fraud was a legitimate, nondiscriminatory reason for suspending her and terminating her employment, and she has not shown that these articulated grounds were pretextual. Evidence of pretext is viewed in light of the employer's justifications and may be established by "evidence the employer's explanation lacked basis in fact, evidence the employee recently received favorable reviews, evidence the employer's proffered reason for its employment decision changed over time, or with evidence the employer treated similarly situated employees who engaged in the

---

[9]We also reject Ackerman's argument she showed retaliatory intent by presenting evidence of disparate treatment of Lewis, who Ackerman contends was a similarly situated employee. As discussed above, Lewis was not similarly situated to Ackerman. See Henry, 950 F.3d at 1015 (setting forth similarly situated elements). The statements of Ackerman's former supervisors are similarly unavailing, showing merely that they might have done things differently—not that Workforce Development management's actions were retaliatory or otherwise illegal. See Kiel, 169 F.3d at 1136 ("In the absence of any evidence of discriminatory intent, however, it is not the prerogative of the courts or a jury to sit in judgment of employers' management decisions.").

protected activity more favorably." Henry, 950 F.3d at 1014–15. Ackerman provides no evidence that Workforce Development's set-forth reasons for termination lacked basis in fact or that its reasons changed over time. Although Ackerman received a "meets expectations" review shortly before her suspension, this review was completed before her fraudulent conduct became known to Workforce Development. See id. at 1015 ("And although Henry did receive a generally positive review on January 24, 2015, this review was given before the full extent of Henry's conduct became known to [his employer].").

Because Ackerman failed to establish any constitutional violation, we conclude that the district court properly granted summary judgment to the individual defendants.

## D. Intentional Infliction of Emotional Distress Claim

The district court concluded that the Iowa whistleblower statute, see Iowa Code § 70A.28, preempted Ackerman's common law claim of intentional infliction of emotional distress, and, in the alternative, that she had failed to present sufficient evidence of outrageous conduct to survive summary judgment on the claim.

Assuming that Ackerman's claim is not preempted, we consider its merits. To establish an intentional infliction of emotional distress claim, Ackerman was required to show, in relevant part, that the defendants engaged in "outrageous conduct." Hedlund, 930 N.W.2d at 723–24 (citation omitted) (setting forth the four elements of an intentional infliction of emotional distress claim). Iowa law requires "substantial evidence of extreme conduct," a standard that "is not easily met, especially in employment cases." Id. at 724 (citations omitted); see also Northrup v. Farmland Indus., Inc., 372 N.W.2d 193, 198 (Iowa 1985) (en banc) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

-21-

atrocious, and utterly intolerable in a civilized community." (quoting Restatement (Second) of Torts § 46 cmt. d)).

Viewing the evidence in the light most favorable to Ackerman, the defendants' conduct was not "sufficiently egregious to satisfy the outrageousness prong" of her claim. See Hedlund, 930 N.W.2d at 723. Ackerman contends that the defendants engaged in outrageous conduct by subjecting her to "an entire program . . . intended to silence her and send a clear message to other potential whistleblowers." She focuses on the conduct that she previously argued violated the Whistleblower Statute. She points to Wahlert's Senate testimony, to Lewis and Hillary's alleged gathering of negative information about her, and to her suspension and "status as a whistleblower." Ackerman also points to the defendants' reporting her for later-dismissed ethical and criminal violations, as well as to the fact that multiple persons were involved in these events. Although Wahlert's testimony may have not been precisely accurate, it was hardly "beyond all possible bounds of decency." See Northrup, 372 N.W.2d at 198. Moreover, as earlier discussed, it was Workforce Development's usual practice to place an employee on paid suspension pending the investigation of similar misconduct. Given Ackerman's ongoing, repeated misstatements to obtain inappropriate insurance benefits, it was not unreasonable for Workforce Development to then refer the matter for potential ethical and criminal violations. Cf. Hedlund, 930 N.W.2d at 725. We conclude that Ackerman's other allegations about workplace conflicts do not rise to the level of outrageous conduct. See Vinson v. Linn-Mar Cmty. Sch. Dist., 360 N.W.2d 108, 119 (Iowa 1984) (employer's eight-step harassment campaign—although perhaps petty, wrong, and malicious—not outrageous despite employer accusing plaintiff of falsifying time records, discharging her for dishonesty, and then reporting the incident to a prospective employer).

## E. Iowa Constitutional Claim

The district court did not err in granting summary judgment on Ackerman's retaliation claim based on the Iowa Constitution's free speech clause, Iowa Const. art. I, § 7. We assume without deciding that the Iowa Supreme Court would recognize such a claim, which is based on the same facts as Ackerman's First Amendment retaliation claim. The parties have not identified any meaningful difference between the state and federal constitutional protections. In light of our holding that Ackerman has failed to establish a violation of her federal constitutional right to free speech, we likewise conclude that she has failed to establish a violation of her state constitutional right to free speech. See State v. Milner, 571 N.W.2d 7, 12 (Iowa 1997) ("[T]he Iowa Constitution generally imposes the same restrictions on the regulation of speech as does the federal constitution."); Des Moines Reg. & Trib. Co. v. Osmundson, 248 N.W.2d 493, 498 (Iowa 1976) ("We believe the federal and state constitutional provisions, which contain almost identical language, impose the same limitation on abridgement of freedom of press."); see also City of W. Des Moines v. Engler, 641 N.W.2d 803, 805 (Iowa 2002) (recognizing that many state constitutions use "language nearly identical to the Iowa" constitution and that "[a] substantial majority of the courts in those states have interpreted this free-speech language as being coextensive with that of the First Amendment to the federal constitution").

## Conclusion

The judgment is affirmed.

_____